**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1.   STATE OF OKLAHOMA | |
| *Plaintiff*, | |
| v. | |
| 1.   UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; | Case No. CIV-23-1052-HE |
| 2.   XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services; | |
| 3.   JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and | |
| 4.   OFFICE OF POPULATION AFFAIRS | |
| *Defendants*. | |

## **COMPLAINT**

1.      This case presents a clear attempt by the federal government to encroach on the right of Oklahoma citizens and their elected representatives to decide the State's policies on important issues.  Plaintiff, the State of Oklahoma ("Oklahoma"), brings this Complaint against the U.S. Department of Health and Human Services and related Defendants, who have overreached by unlawfully suspending and terminating millions of dollars of Title X grant funding.  The funding has been terminated solely because Oklahoma will not commit to providing referrals for abortion, even though Title X expressly *prohibits* federal money from being directed toward abortion.  For nearly half a century, Oklahoma has used Title X funding to improve the lives of

countless Oklahomans who cannot otherwise afford healthcare.  Through its lawless behavior, the federal government is attempting to end that provision, irreparably harming Oklahoma and its citizens.

## PARTIES

### I.   Plaintiff

2.      Oklahoma is a sovereign State of the United States of America.

3.      Oklahoma, through the Oklahoma State Department of Health ("Health Department"), was a Title X grantee until 2023, when Defendants rescinded Oklahoma's Title X funds in an unlawful manner challenged by this Complaint.

### II.   Defendants

4.      The Department of Health and Human Services ("HHS") is a federal agency of the United States.  Under the Public Health Service Act, HHS is responsible for administering the Title X program nationwide.  HHS's headquarters are in Washington, D.C.

5.      Defendant Xavier Becerra is named in his official capacity as the Secretary of HHS.  Secretary Becerra oversees HHS's activities and is responsible for the implementation and enforcement of Title X of the Public Health Service Act.

6.      The Office of Population Affairs ("OPA") is a federal sub-agency within HHS.  Pursuant to authority delegated to it by HHS, OPA administers and directly oversees the Title X program.

7.      Defendant Jessica S. Marcella is named in her official capacity as the Deputy Assistant Secretary for OPA.  Deputy Assistant Secretary Marcella was directly involved in OPA's decision-making on Oklahoma's Title X grant program.

8.      Together, Defendants are referred to as "HHS."

## JURISDICTION & VENUE

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 5 U.S.C. § 702.

10.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

11.     This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705-706, and its inherent equitable powers.

12.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Oklahoma resides in the Western District of Oklahoma for purposes of the venue laws.  In addition, Defendants' challenged actions adversely affect a substantial volume of Oklahoma Title X programs and employees present in this District.

## FACTUAL ALLEGATIONS

**Title X Background and Oklahoma's Title X Program**

13.     Through Title X of the Public Health Service Act, HHS has historically granted Oklahoma substantial funding to provide counseling and family planning services — primarily to individuals who cannot otherwise afford care.  In 1970, Congress enacted Title X of the Public Health Service Act, which created a limited grant program for family planning services. *See* Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, § 6(c), 84 Stat. 1506-508 (codified at 42 U.S.C. § 300a *et seq.*).  Under Title X, HHS may make grants to public or private nonprofit entities so they can operate "voluntary family planning projects" offering a "broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).

14.     Oklahoma, through the Health Department, has long been a recipient of Title X funds to provide needed and essential health benefits to the state's most vulnerable citizens.  The

Health Department was created with the passage of the Oklahoma Public Health Code on July 1, 1963.  Since 1971, the Health Department has continuously received federal grant funds to provide family planning services across the state.  The Health Department receives these funds on a formula basis.

15.     The Health Department has administered the Title X family planning program in Oklahoma for more than forty years.  The Health Department uses the Title X grant to disperse funds through 68 county health departments, who provide critical public health services to rural and urban Oklahoma communities.  These county health departments are a part of the front-line of women's health in Oklahoma, and aim to provide comprehensive, connected care to all patients they serve.  HHS's reckless and arbitrary actions here threaten the very heart of public health services in Oklahoma.

16.     The Health Department has also contracted with the Oklahoma City-County Health Department and the Tulsa County Health Department to ensure family planning services are available in Oklahoma's most heavily populated counties.  The impact of these family planning services is far-ranging.  Countless Oklahoma citizens have been able to receive safe and local access to family planning services through the Health Department's Title X operations. Just from April 1, 2019, until March 31, 2022, for example, a total of 62,306 clients received services through Health Department service sites.

17.     The need of the communities and populations served through county health departments for these crucial health services, as well as the impact of depriving those communities and populations of the full gamut of services, cannot be understated.  In many instances, particularly in rural Oklahoma communities, the Health Department and county health departments may be one of the only access points for critical preventative services for tens or even hundreds of miles.  Some

of these same rural communities may not have a grocery store, let alone the presence of a full-time health provider or women's health provider. Thus, many of the patients the Health Department sees already have difficulty accessing the health care they need because of location, work schedules, and/or transportation issues. These communities are disproportionality impacted by lack of easy access to crucial health services, and that impact will grow as a result of HHS's arbitrary and punitive actions.

18.     Beyond crucial family planning health services, the Health Department and county health departments serve as a gateway to additional health services for which patients and their families may be eligible. For example, the Health Department screens for additional health concerns, as well as for issues such as sex trafficking, to better serve the patients' comprehensive health care needs. The Health Department is then able to connect patients who come in with ancillary health concerns with other providers who can address those specific needs. The Health Department is also able to connect patients with other state resources like the Oklahoma Women, Infants & Children supplemental food program, immunization programs, or even free infant car seats, including installation and safety checks.

19.     The Oklahoma Health Department's Title X program was last reviewed by HHS in 2016. [2016 Program Review, attached as Exhibit 1] At that time, HHS was "[o]verall . . . impressed with the dedication and commitment to family planning in both the central office staff as well as in the field." [*Id.*] The result of the Health Department's site visit by HHS was so positive that HHS did not schedule a return visit until January 2024—eight years later.

20.     As had been done with nearly every grant cycle since 1971, on April 1, 2022, HHS awarded FPHFPA 006507 to OSDH, in the amount of $4.5 million over the next three years, to

continue providing family planning services, as it has historically done, throughout the State of Oklahoma.

**Actions Taken by HHS to Suspend and Terminate Oklahoma's Title X Funding**

21.    On May 25, 2023, HHS sent a letter to the Health Department claiming that the Health Department was in violation of Title X and out of compliance with the terms and conditions of award FPHPA 006507, the "Oklahoma State Department of Health Family Planning Services Project" (the "Award").  [HHS Suspension Letter, attached as Exhibit 2] Again, the Award totals approximately $4.5 million in funding (with the remaining award totaling approximately $3.466 Million) —a substantial amount that is relied on by the Health Department to provide critical health care services to Oklahoma citizens.  Specifically, HHS determined that the Health Department was in violation of 42 C.F.R. § 59.5(a)(5)(i)(c) because the Health Department no longer offered pregnant clients the opportunity to be provided information and counseling about abortion/pregnancy termination.

22.    HHS's suspension came as a surprise to the Health Department, because during the 2016 review, HHS found that the Health Department met the requirements of Title X, which prohibits funds being used for abortion.  [Exh. 1, p. 5]  During that review, HHS specifically noted that "Title X grantees and sub-recipients must be in full compliance with Section 1008 of the Title X statute and 42 C.F.R. § 59.5(a)(5), which prohibit abortion as a method of family planning. Systems must be in place to assure adequate separation of any non-Title X activities from Title X project."  [*Id.*]  HHS determined that this requirement was met by the Health Department's Title X program.  [*Id.*]  HHS further noted that, "Oklahoma State Department of Health Maternal and Child Health policies and procedures, including the sub-recipient contract reviewed contain provisions prohibiting abortion as a method of family planning."  [*Id.* at p.20, ¶ 8.2]

23.     Although Section 59.5(a)(5) says that "[e]ach" Title X project "[n]ot provide abortion as a method of family planning," the Biden Administration re-added in 2021 that each project must nevertheless "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding … [p]regnancy termination." Thus, prior to the suspension letter, on June 29, 2022, Defendants, by letter from Defendant Marcella, provided notice to Title X recipients notice that, in even in light of the Supreme Court's landmark decision in *Dobbs v. Jackson Women's Health Organization*, HHS would require compliance with 42 C.F.R. § 59.5(a)(5)'s alleged requirement of abortion referrals, regardless of any state laws that may exist that would conflict with that requirement.

24.     After receiving the June 2022 letter, the Health Department took several actions to find an agreeable solution with the Health Department that would allow the Health Department to continue receiving Title X funds while complying with Oklahoma law prohibiting abortions.  The Health Department had previously reasonably decided that it could not comply with 42 C.F.R. § 59.5(a)(5)(i)(c) if it required abortion referrals, because Okla. Stat. tit. 21, § 861 makes it a crime under Oklahoma law for any person to advise or procure an abortion for any woman.  On August 29, 2022, the Health Department sought to modify its programmatic procedures to ensure compliance with Oklahoma abortion law, a modification that was denied by HHS on November 9, 2022.  The Health Department sought reconsideration of this determination on November 22, 2022. The Health Department undertook extensive internal processes to determine how to comply with this HHS regulation through early 2023, but it was unable to find a solution allowing compliance with the regulation and Oklahoma law.

25.     The Award was suspended on May 25, 2023, and the Health Department received notice that the Award would be terminated on June 27, 2023.  [HHS Termination Notice, attached

as Exhibit 3] By letter dated July 27, 2023, the Health Department appealed that ruling.  [Health Department Appeal Letter, attached as Exhibit 4]

26.    On or about September 22, 2023, while the Health Department administrative appeal was still pending, HHS announced supplemental funding, supposedly to support the provision of Title X services in Oklahoma.  Funds that would previously have been directed to the Health Department were instead apparently reallocated to Community Health Connection, Inc. and Missouri Family Health Council, Inc. — a Missouri entity.  Community Health Connection, Inc. was awarded $216,000 in newly authorized federal funds, while Missouri Family Health Council, Inc. was awarded $3,250,000 in supplemental funds.  [HHS Grant Award Announcements, available   at   https://opa.hhs.gov/about/news/grant-award-announcements/hhs-issues-11-million-supplemental-funding-support-provision, last accessed Nov. 16, 2023]  HHS's award rendered the Health Department's administrative appeal futile.

27.    That is to say, the bulk of the funding earmarked for Oklahoma was awarded to an out-of-state entity despite the Health Department's decades-long track record of successfully providing family planning services to the citizens of State of Oklahoma.  HHS advised that "[w]ith this supplemental funding, Missouri Family Health Council will expand into Oklahoma . . . ."  [*Id.*] The federal government's sole justification for disrupting decades of health services and determining that an out-of-state entity in Missouri was in the best position to provide necessary health services to citizens in the State of Oklahoma is that the Health Department refuses to approve of referrals for abortions.

**Oklahoma's State Laws on Abortion**

28.    Under Oklahoma law, the crime of advising or procuring an abortion for any woman is punishable as a felony.  *See* 21 O.S. § 861.  This statute came into effect immediately following

the Supreme Court's decision in *Dobbs*, 142 S. Ct. 2228 (2022).  In *Dobbs*, the Court held that the U.S. Constitution does not provide a right to abortion and that authority to regulate abortion must be returned to the people and their elected representatives. Exercising that right, the elected representatives in Oklahoma have prohibited abortion except when necessary to preserve a pregnant woman's life.  They have also made it illegal to advise a woman to obtain an abortion, except when necessary to preserve a pregnant woman's life.

29.    In addition, the Oklahoma Legislature has insisted that no Oklahoma person or Oklahoma health care facility, public or private, can be required to perform or participate in any abortion unless the life of the mother is at stake.  *See* 63 O.S. §§ 1-728c, 1-728d, 1-741.  And the Legislature has made it unlawful for any state agency, employee, or political subdivision "to perform or assist an abortion not necessary to save the life of the mother," and it has made it "unlawful for any funds received or controlled" by any state agency, employee, or political subdivision "to be used to encourage a woman to have an abortion not necessary to save her life, except to the extent required for continued participation in a federal program." 63 O.S. 1-741.1.

30.    Title X in no way requires abortion referrals for a State's continued participation. Rather, sans authority, HHS seeks to punish Oklahoma for the policies adopted by Oklahoma's elected representatives to protect unborn life.  HHS is interfering with rights reserved to the people and their elected representatives despite a clear federal mandate that Title X funds should not be used in programs where abortion is offered as a method of family planning.

31.    Even if abortion referrals did not violate Oklahoma law, requiring Oklahoma to participate in making such referrals violates the plain language of Title X, and a State would be well within its authority to refuse to make such referrals while still receiving Title X funds.

32.     Indeed, just months after approving Oklahoma's program, HHS threatened to strip the Health Department's millions of dollars of Title X funding because Oklahoma would not commit to offering abortion counseling and referrals, which HHS now requires in contradiction to Title X's language.  Stuck between HHS's baseless abortion-referral requirement and the State's lawful abortion prohibition, the Health Department properly filed an administrative appeal to advise HHS of Oklahoma's legal requirements and explain why Oklahoma could not comply with the HHS regulation.

33.     Despite Oklahoma's appeal, HHS proceeded to strip all of Oklahoma's funding and primarily funnel it to a Missouri entity, as agency leadership had already identified Oklahoma as one of two States on its target list for policing abortion referrals.  The Health Department's refusal to refer women to abortion providers was the only reason given for stripping Oklahoma's funding.

34.     This is unsurprising. Since *Dobbs* the Biden Administration has made promoting abortion at all costs one of its central policy goals. Relevant here, an Executive Order President Biden issued within weeks of *Dobbs* stated that it was the Administration's policy to require "Title X clinics" to share information about how to obtain an abortion. [Executive Order, July 8, 2022, available at <https://www.whitehouse.gov/briefing-room/presidential-actions/2022/07/08/executive-order-on-protecting-access-to-reproductive-healthcare-services/>, last accessed November 17, 2023]

35.     In a similar vein, Defendant Becerra announced that the *Dobbs* decision was "unconscionable" and that HHS would "double down and use every lever we have to protect access to abortion care."  [HHS Secretary Becerra's Statement on Supreme Court Ruling in *Dobbs v. Jackson Women's Health Organization*, June 24, 2022, available at <https://www.hhs.gov/about/news/2022/06/24/hhs-secretary-becerras-statement-on-supreme-

court-ruling-in-dobbs-v-jackson-women-health-organization.html>, last accessed November 17, 2023]

36.     Oklahoma now brings this action against HHS and other named Defendants to set aside HHS's unlawful, arbitrary, and capricious termination decision and restore Oklahoma's rescinded Title X funding.  Judicial intervention is necessary to ensure Oklahoma may continue its longstanding track record of successfully providing family planning services to Oklahoma citizens.

**Oklahoma's Right to Decide Policy on Controversial Issues**

37.     The current administration's actions go beyond implementation of new regulations and interpretations.  HHS is actively targeting the State of Oklahoma and stripping the Health Department of funding based on important determinations made by Oklahomans and Oklahoma's elected representatives on issues that are within the State's right and authority to decide.

38.     HHS's actions far exceed the power granted to HHS to implement Title X. Administrative agencies have power to promulgate regulations, but only to the extent that authority is delegated by Congress.  Congress alone has the "power of the purse," and executive agencies do not have authority to impose conditions on federal funding or to disobey statutory mandates simply because of the administration's political decisions.

39.     In addition, for Congress to place conditions on a State's receipt of federal funds it must do so *unambiguously*, which allows states to exercise their choice knowingly, cognizant of the consequences of their participation. And even then, the conditions placed on receipt of funds cannot cross the line from enticement to impermissible coercion, such that states have no choice but to accept the funding and enact or administer a federal regulatory program.  Title X, it barely needs to be said, does not unambiguously require abortion referrals.

40.     HHS's actions are nothing more than an attempt to override the sovereign rights and authority of the State of Oklahoma to govern its people by forcing the Health Department to comply with this Administration's political positions that contravene Title X and are directly in conflict with Oklahoma state law.

41.     Further, in terminating the grant funds to the State of Oklahoma and in turn awarding those funds to an out-state-entity or entities in Missouri, HHS has knowingly and willfully encouraged an entity to disregard Oklahoma law.  By awarding Missouri Family Health Council, Inc. funds to provide services in Oklahoma, HHS presumably expects and anticipates that entity will provide services in Oklahoma. HHS will also presumably condition Missouri Family Health Council, Inc.'s receipt of funds on compliance with all of HHS's regulations, including 42 C.F.R. § 59.5(a)(5)(i)(c).

42.     To the extent that Missouri Family Health Council, Inc. provides services in Oklahoma and provides pregnancy termination referrals, Missouri Family Health Council, Inc. will likely be in violation of Oklahoma law, subject to prosecution as a felony.

43.     If, however, HHS does not require Missouri Family Health Council, Inc. to comply with its beliefs about what the HHS regulations, including 42 C.F.R. § 59.5(a)(5)(i)(c), require, that amounts to an admission by that HHS's termination of Oklahoma's Title X funding is simply a political stunt directing at harming Oklahoma based on the current administration's disagreement with Oklahoma's public policy.

**Title X's Ban on Pregnancy Termination as a Method of Family Planning**

44.     When Title X was enacted, HHS was given the authority to make grants to support "voluntary family planning projects" for the purpose of offering "a broad range of acceptable and effective family planning methods and services."  Again, Title X *expressly* prohibits grant funds

from "be[ing] used in programs where abortion is a method of family planning." 42 U.S.C. §
300a-6. Whether Title X funding provisions would "include abortion as a method of family
planning" was a point of debate while Congress considered Title X. 116 Cong. Rec. 37375 (Nov.
16, 1970) (statement of Rep. Dingell). Title X's supporters responded by proposing language
clarifying that Title X would not be used to fund abortions. Specifically, since Title X's passage,
Section 1008 of the statute has commanded that "[n]one of the funds appropriated under this
subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C.
§ 300a-6. Through this language, "committee members clearly intend[ed] that abortion is not to
be *encouraged or promoted in any way* through" Title X. 116 Cong. Rec. 37375 (Nov. 16, 1970)
(statement of Rep. Dingell) (emphasis added). "Programs which include abortion as a method of
family planning are not eligible for funds allocated through this act." [*Id.*]

**HHS's Flip-Flopping Regulations**

45. Despite this seemingly clear Congressional mandate, HHS has historically
implemented rules and regulations for Title X that flip-flop based on the presidential administration.
After implementation of Title X, HHS construed the law as "prohibiting Title X projects *from in*
*any way promoting or encouraging abortion* as a method of family planning." 53 Fed. Reg. 2922,
2923 (Feb. 2, 1988) (emphasis added). However, from the mid-1970s to the late-1980s, HHS
permitted—and then in 1981 adopted guidelines requiring—Title X recipients to offer pregnant
women "nondirective options counseling on pregnancy termination (abortion) . . . followed by
referral for these services if she so requests." *Id.*

46. In 1988, to follow Title X more closely, HHS issued a final rule prohibiting Title X
providers from making referrals for or counseling women regarding abortion as a method of family
planning. *Id.* at 2945. Title X providers could refer pregnant clients only to "available providers

that promote the welfare of mother and unborn child," and could not use this list "as an indirect means of encouraging or promoting abortion . . . [or] steering clients to providers who offer abortion as a method of family planning." *Id.* HHS determined that these requirements were "more consistent with" the Title X provision prohibiting abortion funding. *Id.* at 2932.

47.     In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court upheld the 1988 regulations. The *Rust* Court held that HHS had permissibly justified its new rule, including by explaining the agency's view that the 1988 regulations were "more in keeping with the original intent of the statute." 500 U.S. at 186-87.

48.     However, in 1993, HHS again reversed course and suspended the 1988 Rule. In 2000, HHS began requiring Title X recipients to make abortion referrals upon request from a patient. 65 Fed. Reg. 41,270.

49.     In 2019, to more faithfully implement Congressional intent with respect to Title X, HHS promulgated a rule ("2019 Rule") regarding proper implementation of Section 1008's abortion-funding prohibition. *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019). The 2019 Rule adopted many of the same requirements of the 1988 Rule upheld in *Rust*, including the bar on Title X grantees "perform[ing], promot[ing], refer[ing] for, or support[ing] abortion as a method of family planning." *Id.* at 7788-90. HHS concluded that this approach reflects "the best reading of" Section 1008, "which was intended to ensure that Title X funds are also not used to *encourage or promote* abortion." *Id.* at 7777 (emphasis added). HHS determined that prior regulations "are inconsistent" with section 1008 "insofar as they require referral for abortion as a method of family planning." *Id.* at 7723.

50.     In 2021, HHS flip-flopped again by promulgating a regulation that it now claims requires abortion referrals. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021). Although this would be

contrary to Title X's text, HHS's 2021 Rule remains in effect today and, pursuant to HHS's interpretation, generally requires grantees like the Health Department to make abortion counseling and referrals available upon patients' requests.  42 C.F.R. § 59.5(a)(5)(i)(C) and (a)(5)(ii).  Again, HHS acknowledges that Title X provides that no funds "shall be used in programs where abortion is a method of family planning."  86 Fed. Reg. at 56,149.  HHS purports to interpret the provision to now mean that Title X programs "must . . . [n]ot *provide* abortion as a method of family planning."  42 C.F.R. § 59.5(a)(5) (emphasis added).  However, HHS's addition of the limiting modifier "provide" clearly deviates from the statutory text.  The 2021 regulation states that Title X programs "*must* [o]ffer pregnant clients the opportunity to be provided information and counseling regarding . . . [p]regnancy termination." 42 C.F.R. § 59.5(a)(5)(i)(C) (emphasis added).  Further, "[i]f requested," the grant recipient must "provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request." *Id.* § 59.5(a)(5)(ii).

51.     HHS's decision to terminate Oklahoma's Title X funding is particularly egregious because Congress has only strengthened Title X's prohibition on using grant funds in programs that use pregnancy termination as a method of family planning in recent decades.  Since 2000, all Title X appropriations bills have expressly banned funding for elective abortions.  *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. H, Tit. V, § 506, 136 Stat. 4459, 4908 (2023).  Each has further required that "all pregnancy counseling" conducted under Title X "shall be nondirective"—thus prohibiting Title X recipients from encouraging women to seek abortions. *See, e.g.*, *id.* at Div. H, Tit. II, 136 Stat. 4459, 4857.

52.     Nevertheless, the current administration has offered an implausible and competing interpretation of the prohibition on using grant funds in programs where abortion is a method of

family planning.   The Supreme Court has never addressed a rule mandating that Title X program recipients refer patients and clients to abortion providers; on the other hand, it *has* approved a rule *prohibiting* such referrals. This speaks volumes.  Oklahoma submits that the current regulations deviate significantly and inappropriately from the Congressional mandate.

**Irreparable Harm to Oklahoma**

53.     HHS's decision to discontinue Oklahoma's Title X program inflicts a series of severe, irreparable harms on the State of Oklahoma and its citizens. The harms can only be remedied by a judicial order setting the termination aside and resetting the status quo prior to HHS's unlawful decision.

54.     First, HHS's award of supplemental funds to an out-of-state entity to provide services in Oklahoma is tantamount to recruiting that entity to enter the State of Oklahoma for the sole purpose of violating Oklahoma law on abortion.  The Supreme Court has recognized that such laws are within the purview of the people and their elected representatives to make.  Oklahoma has exercised that right, the Biden Administration does not approve, and HHS has overreached as a result.  The only purpose of providing supplemental funding to the Missouri entity is to have that entity provide abortion counseling and referrals that the Health Department cannot provide under Oklahoma law.   Otherwise, there is and can be no dispute that the Health Department has administered the State's Title X program exceedingly well for over 40 years.  Oklahoma should not have to stand idly by as an out-of-state entity sanctioned by the federal government operates in the State for the sole purpose of violating Oklahoma law.

55.     The Health Department is further perplexed by HHS's decision to reallocate the bulk of the State's award to a non-Oklahoma entity due the broad diversity of languages and cultural dialects present throughout Oklahoma.   Because of Oklahoma's rich immigrant and Native

American heritage, several dozen dialects are spoken throughout the State.  In an effort to maintain compliance with HHS's translation requirement and effectively provide family planning services to Oklahomans, the Health Department has built the infrastructure to provide these crucial translation and language services.  A lack of such services can result in major barriers to providing adequate health care, as patients may be forced to rely on an abusive or untrustworthy family member or, say, a 10-year-old child to translate confidential, complicated, and potentially embarrassing information.

56.     Because the Health Department has for decades relied on Title X grants to build this critical infrastructure and services described herein, it would be impossible for an out-of-state entity with little to no current presence in the state to come in and immediately fill these gaps.  HHS's reckless decision will irreparably harm the public health of Oklahomans.

57.     Undoubtedly, HHS's unlawful termination of Oklahoma's Title X funds impacts Oklahoma's financial and public-health interests by stripping the State of a federal grant worth approximately $4.5 million (with the remaining Award totaling approximately $3.466 Million).  Without the federal Title X funds, Oklahoma's public health programs are at risk, to say the least.  Although the Oklahoma Legislature may have been able to temporarily fill in the gaping hole left by HHS, that still strips the State of millions of dollars that could have been used elsewhere, and there is no guarantee that such stop-gap measures will be available in the future.

58.     Further, HHS's unlawful decision threatens the continued employment of large numbers of state employees.  Oklahoma's approved Title X budget accounted for salaries and wages totaling $3,631,462.  The loss of funding puts the continued employment of those employees at risk.  It further risks the loss of those employees' time, training, and knowledge, in which Oklahoma has substantially invested.  Oklahoma has employees who have been with the

Health Department for more than 30 years who are devoted to Oklahoma's Title X program.  The loss of these employees due to reduced funding could be catastrophic to Oklahoma's public health efforts.

59.    Moreover, the loss of Title X funding means that Oklahoma is no longer eligible for discounts for family planning drugs and devices.  Title X providers receive federally sponsored discounts on such drugs and devices.  Now that the Health Department is no longer a Title X provider, it is ineligible for these discounts, requiring it to plan and obtain additional resources to satisfy the increased costs.

60.    Defendants' decision also risks hampering Oklahoma's ability to obtain future federal funding.  Indeed, in May 2023, Defendants threatened the State, saying that the State's termination as a Title X grant recipient "must be reported to the . . . Federal Awardee Performance and Integrity Information System," which "may affect [the State's] ability to obtain future Federal funding." [HHS Suspension Letter, Exh. 2]  This threat creates an enormous risk that Oklahoma may lose federal funding for *other* grant programs, which may cripple the State's budget and ability to provide necessary services to citizens.

61.    Oklahoma lacks adequate remedies outside of obtaining judicial relief.  Without an order from this Court, Oklahoma cannot recoup lost federal funds or prevent the stripping of funds in the future.  Instead, the State must redirect its own funds to fill the gap, or else forfeit this longstanding public-health program.  Oklahoma faces substantial challenges to later recover from HHS for the harm it has caused, given Defendants' sovereign immunity.

## CLAIMS FOR RELIEF

### CLAIM I
### (Violation of APA, 5 U.S.C. § 706(2)(A), (C) for an Agency Action Not in Accordance with Law and in Excess of Statutory Authority)

62.     Oklahoma repeats and incorporates by reference the allegations of the preceding paragraphs.

63.     HHS and OPA are federal agencies within the meaning of the APA.

64.     Defendants' decision to discontinue Oklahoma's Title X funding is a final agency action within the meaning of 5 U.S.C. § 704.  Oklahoma lacks another adequate remedy in court. Though Oklahoma did initiate an optional administrative appeal, HHS's subsequent actions—including its decision to reallocate all of Oklahoma's Title X funding to other entities *during the appeal*—demonstrate that the administrative appeal is futile.

65.     The APA requires courts to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

66.     HHS's decision to terminate Oklahoma's Title X grant contravenes the governing statutory provisions and HHS's own Title X regulations.

67.     At the outset, if HHS's current interpretation is correct, HHS's current regulation, 42 C.F.R. § 59.5(a)(5)(i)(c)), is inconsistent with federal law, which directs that "[n]one of the funds appropriated" under Title X "shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  HHS's regulation, in HHS's view, forces Title X providers to engage in abortion referrals or counseling, rendering their programs ones "where abortion is a method of family planning."  *Id.*  HHS's interpretation of the statute contradicts Congress's plain intention that "abortion is not to be encouraged or promoted in any way through" Title X funding. 116 Cong. Rec. at 37,375 (Nov. 16, 1970).

68.     Because HHS's interpretation of its current regulation, 42 C.F.R. §
59.5(a)(5)(i)(c)), is inconsistent with Section 1008, it is invalid under the APA.  Defendants'
decision to discontinue Oklahoma's Title X funding is likewise invalid and should be set aside
because OPA unquestionably issued that decision based on its conclusion that Oklahoma was
violating the current regulations.

69.     HHS has no legal authority to support its current regulation or statutory
interpretation.  In *Rust*, 500 U.S. 173 (1991), the Supreme Court upheld an HHS rule *prohibiting*
abortion referrals.  In *Rust*, the Supreme Court specifically upheld the prohibition on recipients of
Title X funding from counseling concerning the use of abortion as a method of family planning
because "the Title X program is designed not for prenatal care, but to encourage family planning . .
. .  This is not a case of the government 'suppressing a dangerous idea,' but of a prohibition on a
project grantee or its employees from engaging in activities ***outside of the project's scope***."  500
U.S. at 193-94 (emphasis added).  As HHS previously recognized, the 1988 and 2019 regulations
reflect the best reading of the statute and do not permit Title X funds to flow to abortion-related
service and counseling.  HHS's current regulation requires exactly the opposite, according to HHS.
HHS's current regulation is outside the project's scope, and HHS's regulation and interpretation
therefore fall outside the zone of reasonable interpretation, because HHS effectively resolves a policy
issue of major political significance without clear congressional authority.  *See West Virginia v. EPA*,
142 S. Ct. 2587, 2608-10 (2022).  As the Supreme Court recently explained:

> Extraordinary grants of regulatory authority are rarely accomplished through
> "modest words," "vague terms," or "subtle device[s]."  Nor does Congress typically
> use oblique or elliptical language to empower an agency to make a "radical or
> fundamental change" to a statutory scheme.  Agencies have only those powers
> given to them by Congress, and "enabling legislation" is generally not an "open
> book to which the agency [may] add pages and change the plot line."  We presume
> that "Congress intends to make major policy decisions itself, not leave those
> decisions to agencies."

*Id.* (citations omitted).   Common sense and straightforward textualism dictate that HHS's interpretation does not reflect Congressional intent, and HHS' regulation must be set aside.

70.      Further, HHS's decision to suspend and terminate Oklahoma's Title X funding violates HHS's own Title X regulations.   In reaching the termination decision, HHS improperly interpreted its own regulations by requiring Title X grantees like Oklahoma to provide counseling and referral for *all* abortion options regardless of their legality and availability in the relevant jurisdiction.

71.      Because HHS's actions also reflect an impermissible reading of HHS's regulations, HHS has violated the APA on this independent basis and should be set aside.

## CLAIM II
**(Violation of APA, 5 U.S.C. § 706(2)(A), (D) for an Agency Action Taken Without Required Procedures or Explanation)**

72.      Oklahoma repeats and incorporates by reference the allegations of the preceding paragraphs.

73.      The APA requires courts to set aside agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

74.      As set out in Claim I, HHS's interpretation of federal law is inconsistent with the regulations implementing Title X.   Those regulations plainly do not require Title X grantees to provide counseling and referrals for pregnancy termination regardless of the legality of those procedures.

75.      HHS's interpretation thus "effect[s] a substantive change in the regulations" that HHS already issued and constitutes a new substantive rule that HHS could only promulgate

through notice-and-comment rulemaking under 5 U.S.C. § 553(b).  No exceptions to notice-and-comment rulemaking apply.  5 U.S.C. § 553(b).

76.     HHS failed to use notice-and-comment rulemaking procedures to promulgate its interpretation.  Instead, HHS unlawfully unveiled its new interpretation only as part of HHS's decision to terminate Oklahoma's Title X funding.  Because that decision reflects a new rule that did not arise from the required notice-and-comment procedures, it is unlawful and should be "set aside."  5 U.S.C. § 706(2).

77.     The APA further requires agencies to provide "reasoned explanation" for their decisionmaking.  At a minimum, this directive means agencies must "offer genuine justifications for important decisions" at the time the decisions are issued.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019).  HHS's failure to provide genuine justifications for its decisions violates HHS's APA duty to provide an adequate explanation for its action.  The decision to discontinue Oklahoma's Title X funding should therefore be set aside.

**CLAIM III**
**(Violation of APA, 5 U.S.C. § 706(2)(B), for an Agency Action Contrary to the U.S. Constitution)**

78.     Oklahoma repeats and incorporates by reference the allegations of the preceding paragraphs.

79.     The APA requires courts to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

80.     HHS's decision to discontinue Oklahoma's Title X funding is unconstitutional.

81.     HHS's decision violates the Spending Clause of the United States Constitution because the conditions imposed on the grant of federal money by HHS are not unambiguous.  The requirements imposed by HHS on Oklahoma are nowhere to be found in Title X.  At most, HHS's

regulation and interpretation rests on the assertion that Title X is ambiguous, and thus permits HHS to require Title X grantees to provide counseling and referrals for pregnancy termination services regardless of their legality or availability.  Ambiguous statutes, however, cannot give rise to new duties on the part of Spending Clause recipients.  Nor can agencies impose new duties Congress did not plainly direct as part of a Spending Clause program.

82.     The decision to terminate Oklahoma's Title X funding also unconstitutionally rests on a condition that is unrelated to the purposes of the program – providing referrals for services that are not mandated by Title X and are illegal and unavailable under Oklahoma law.  HHS's interpretation is contrary to, and in fact undermines, Title X because it is inconsistent with the prohibition on the use of Title X funds in "programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.

83.     HHS's interpretation and decision to terminate Oklahoma's Title X funding expressly violate the Spending Clause by imposing unforeseen conditions divergent from Congress's Title X legislation.  At a minimum, HHS's actions present serious constitutional issues that counsel against deferring to HHS's interpretation of Title X as reasonable.

84.     Conditions placed on receipt of funds are unconstitutional when the condition goes beyond defining the limits of the program and instead forces recipients to adopt the Government's view on an issue of public concern . . . ."  *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218(2013).  The Supreme Court has stated:

> For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to 'produce a result which (it) could not command directly.'  Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

85.     HHS's interpretation and termination decision thus violate the U.S. Constitution and should be set aside on this basis.

**CLAIM IV**
**(Violation of APA, 5 U.S.C. § 706(2)(A) for an Arbitrary and Capricious Agency Action)**

86.     Oklahoma repeats and incorporates by reference the allegations of the preceding paragraphs.

87.     The APA requires courts to set aside agency action that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

88.     HHS acted arbitrarily and capriciously in rescinding Oklahoma's Title X grant.

89.     The decision to terminate Oklahoma's Title X funding is a reversal from HHS's prior conclusion in the 2016 Program Review that the Health Department complied with Title X's prohibition on abortion.  Reversing that determination is unexplained and is therefore arbitrary and capricious.

90.     HHS's decision further ignores Oklahoma's reliance interests in Title X grant funding — funding that the State has received for over 40 years, and which supports an important, longstanding program that promotes the health of over countless citizens and employs numerous workers.  HHS's failure to consider this important aspect itself renders HHS's determination arbitrary and capricious.  HHS's lack of consideration of Oklahoma's legitimate reliance on its Title X funding is especially problematic here, where HHS has changed course from its prior position affirming Oklahoma's Title X compliance.

91.     OPA's May 24, 2023, letter rests on arbitrary reasoning.  The letter asserts that, notwithstanding Oklahoma's prohibition on abortions, the Health Department could comply with HHS's current requirements by referring individuals to abortion providers out of the State.  This

rationale arbitrarily overlooks that requiring Title X recipients to refer individuals out of State may render Oklahoma's family planning methods and services less effective by providing a referral that is impracticable for many program beneficiaries.

92.     Defendants additionally failed to adequately consider and reasonably explain the lawfulness of its decision; namely, whether Defendants permissibly interpreted the relevant regulations, including the requirement that referrals must be feasible.  42 C.F.R. § 59.5(b)(8).  HHS also has failed to consider the effect of *Dobbs* and state-level prohibitions on abortion-related activity among health providers.  The resulting regime risks coercing Oklahoma providers to violate duly enacted state provisions governing the provision of abortions.  To say the least, this dynamic is an important aspect of the problem that HHS needed to consider, but unlawfully ignored.

## CLAIM V
### (Relief Under the Declaratory Judgment Act (28 U.S.C. § 2201) Against All Defendants)

93.     Oklahoma repeats and incorporates by reference the allegations of the preceding paragraphs.

94.     The Declaratory Judgment Act provides that, "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

95.     This case presents an actual controversy.  Oklahoma maintains that it is entitled to reinstatement of its prior Title X grant, as well as continued funding of its public-health programs under Title X—a sum of around $3.466 Million.

96.      Through this Complaint, the State of Oklahoma has filed an appropriate pleading to have its rights declared.  This Court can resolve this controversy by declaring that Oklahoma has a right to receive Title X funding notwithstanding its policy of declining to make abortion referrals as part of its Title X programming, consistent with Oklahoma state law.

## PRAYER FOR RELIEF

WHEREFORE, the State of Oklahoma respectfully requests that this Court:

a) Enter a judgment declaring, pursuant to 28 U.S.C. § 2201, that HHS's termination of Oklahoma's Title X funding was unlawful, arbitrary, and capricious and that Oklahoma's policies entitle it to continue to receive Title X funding;

b) Set aside HHS's June 27, 2023, final decision discontinuing Oklahoma's Title X grant;

c) Enter a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing any decision to terminate Oklahoma's Title X funding on the grounds discussed above;

d) Permanently enjoin Defendants from withholding Title X funds from Oklahoma for refusing to offer counseling and referrals (including out-of-state) for pregnancy terminations that are otherwise illegal under Oklahoma law;

e) Require Defendants to reinstate Oklahoma's Title X funds, retroactive from June 27, 2023;

f) Award Oklahoma its attorney fees and costs incurred in bringing this action; and

g) Grant any and all other relief the Court deems just and proper.

Respectfully submitted,

s/ R. Tom Hillis

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
OFFICE OF ATTORNEY GENERAL
    STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audry.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax:   (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension, Suite 600
Oklahoma City, OK 73114
Phone: (405) 844-9900
Fax:   (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*