# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA,

         Plaintiff,

   v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

         Defendants.

No. 5:23-cv-01052-HE

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
## <u>FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

    I.    Title X ............................................................................................................ 2

    II.    Regulatory History and the 2021 Title X Rule ...................................................... 3

    III.    Oklahoma's Title X Funding & HHS's Termination Decision .......................... 5

    IV.    This Lawsuit ................................................................................................. 7

LEGAL STANDARD ..............................................................................................................7

ARGUMENT ........................................................................................................................8

    I.    Oklahoma Is Not Likely to Succeed on the Merits........................................... 8

        A.    HHS's Decision Is Authorized by Title X................................................... 8

        B.    HHS's Decision Does Not Violate the Weldon Amendment...............11

        C.    HHS's Decision Is Consistent with Agency Regulations. .....................13

        D.    HHS's Decision Is Neither Arbitrary Nor Capricious...........................15

        E.    Notice-and-Comment Procedures Were Not Required. ........................19

        F.    HHS's Decision Does Not Implicate the Spending Clause. .................20

    II.    Oklahoma Has Not Demonstrated Irreparable Harm...................................... 26

    III.    The Public Interest Weighs Against a Preliminary Injunction. ........................ 29

CONCLUSION ...................................................................................................................30

# TABLE OF AUTHORITIES

Cases

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*,
  570 U.S. 205 (2013) ...................................................................................................... 10, 26

*Allina Health Servs. v. Sebelius*,
  756 F. Supp. 2d 61 (D.D.C. 2010) ............................................................................27

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ............................................................................................... 20, 23

*Auer v. Robbins*,
  519 U.S. 452 (1997) ...................................................................................................13

*Becerra v. Louisiana*,
  Nos. 21A240, 21A241, 2021 WL 8939385 (U.S. Dec. 30, 2021) ...........................23

*Bennett v. Kentucky Department of Education*,
  470 U.S. 656 (1985) .............................................................................................. 23, 24

*Biden v. Missouri*,
  595 U.S. 87 (2022) ......................................................................................................23

*Biden v. Missouri*,
  No. 21A240, 2021 WL 8946189 (U.S. Dec. 30, 2021) ............................................23

*Blanca Tel. Co. v. FCC*,
  743 F.3d 860 (D.C. Cir. 2014) .................................................................................19

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*,
  462 F.3d 219 (2d Cir. 2006) ......................................................................................8

*Castellano v. Choinski*,
  No. 3:07-cv-772, 2008 WL 749857 (D. Conn. Mar. 19, 2008)...............................11

*City & Cnty. of San Francisco v. Azar*,
  411 F. Supp. 3d 1001 (N.D. Cal. 2019) ..................................................................13

*City of Arlington, Tex. v. FCC*,
  569 U.S. 290 (2013).....................................................................................................10

*Clay v. Okla. Dep't of Corr.*,
No. CIV-12-1106-C, 2013 WL 3058122 (W.D. Okla. June 17, 2013) ...................................11

*Colorado v. EPA*,
989 F.3d 874 (10th Cir. 2021) ........................................................................................................7

*Colorado v. United States Department of Justice*,
455 F. Supp. 3d 1034 (D. Colo. 2020) ......................................................................................25

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. Jan. 12, 2023) .........................................................................................27

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) ............................................................................................29

*CoverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) ..............................................................................................28

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) .....................................................................................................................20

*De Beers Consol. Mines Ltd. v. United States*,
325 U.S. 212 (1945) .....................................................................................................................11

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) .......................................................................................................................5

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) .............................................................................................. 7, 27

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) .................................................................................................................15

*Gruver v. La. Bd. of Supervisors*,
959 F.3d 178 (5th Cir. 2020) .......................................................................................................22

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
138 S. Ct. 2448 (2018) .................................................................................................................18

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .................................................................................................. 20, 21

*Kentucky v. Yellen*,
67 F.4th 322 (6th Cir. 2023) .......................................................................................................26

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ................................................................................................13

*Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020) ................................................................................................15

*Mayweathers v. Newland*,
    314 F.3d 1062 (9th Cir. 2002) ....................................................................................23

*Mich. Dep't of Envtl. Quality v. Browner*,
    230 F.3d 181 (6th Cir. 2000) ......................................................................................17

*Miss. Comm'n on Envtl. Quality v. EPA*,
    790 F.3d 138 (D.C. Cir. 2015) ....................................................................................22

*Montford and Co. v. SEC*,
    793 F.3d 76 (D.C. Cir. 2015) ......................................................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................................15

*N. Air Cargo v. U.S. Postal Serv.*,
    756 F. Supp. 2d 116 (D.D.C. 2010) ............................................................................27

*Nat'l Fed. of Indep. Business v. Sebelius*,
    567 U.S. 584 (2012) ....................................................................................................20

*New York v. HHS*,
    414 F. Supp. 3d 475 (2019) ........................................................................................13

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................................................29

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023) ................................................................................*passim*

*Ohio v. Becerra*,
    577 F. Supp. 3d 678 (S.D. Ohio 2021) ......................................................................27

*Otsuka Pharm. Co. v. Burwell*,
    302 F. Supp. 3d 375 (D.D.C. 2016) ............................................................................19

*Otsuka Pharm. Co. v. Burwell,*
    No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) .................................................27

*Pennhurst State School & Hosp. v. Halderman,*
    451 U.S. 1 (1981) .................................................................................................. 20, 21

*Planned Parenthood Fed'n of Am., Inc. v. Heckler,*
    712 F.2d 650 (D.C. Cir. 1983) .................................................................................10

*Planned Parenthood of Houston & Se. Tex. v. Sanchez,*
    403 F.3d 324 (5th Cir. 2005) ...................................................................................10

*Port City Props. v. Union Pac. R.R. Co.,*
    518 F.3d 1186 (10th Cir. 2008) ...............................................................................27

*Prairie Band of Potawaomi Indians v. Pierce,*
    253 F.3d 1234 (10th Cir. 2001) ...............................................................................27

*Reuters Ltd. v. United Press Int'l, Inc.,*
    903 F.2d 904 (2d Cir. 1990) ....................................................................................27

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ...................................................................................................3

*Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev.,*
    No. 14-1823-RMW, 2014 WL 2192052 (N.D. Cal. May 23, 2014) .......................29

*Sorenson Commc'ns, Inc. v. FCC,*
    567 F.3d 1215 (10th Cir. 2009) ...............................................................................19

*State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n,*
    812 F.2d 288 (6th Cir. 1987) ...................................................................................27

*Teufel v. Dep't of the Army,*
    608 F. App'x 705 (10th Cir. 2015) ..........................................................................17

*Valley Family Planning v. North Dakota,*
    661 F.2d 99 (8th Cir. 1981) ......................................................................................9

*W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury,*
    59 F.4th 1124 (11th Cir. 2023) .............................................................20, 21, 24, 25

*Wallace v. Dep't of Air Force,*
    879 F.2d 829 (Fed. Cir. 1989) .................................................................................17

*Washington v. Azar,*
  426 F. Supp. 3d 704 (E.D. Wash. 2019)................................................................13

*Winter v. NRDC,*
  555 U.S. 7 (2008) ............................................................................................... 7, 26

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ...............................................................................27

**Statutes**

5 U.S.C. § 705.......................................................................................................7, 8

34 U.S.C. § 10155 ....................................................................................................25

42 U.S.C. § 300 .........................................................................................................2

42 U.S.C. § 300a-4 .............................................................................................*passim*

42 U.S.C. § 300a-6 .....................................................................................................3

42 U.S.C. § 802 .........................................................................................................25

42 U.S.C. § 1395x .....................................................................................................23

Consolidated Appropriations Act, 2022,
  Pub. L. No. 117-103, 136 Stat. 49 (Mar. 15, 2022) ........................................ 11, 13

Regulations

42 C.F.R. § 59.5 ................................................................................................*passim*

42 C.F.R. § 59.7 .........................................................................................................2

42 C.F.R. § 59.8 ...........................................................................................2, 18, 28

42 C.F.R. § 59.9 .........................................................................................................2

45 C.F.R. part 75.........................................................................................................2

45 C.F.R. subpart F....................................................................................................3

45 C.F.R. § 75.300 .....................................................................................................2

45 C.F.R. § 75.371 .....................................................................................................3

45 C.F.R. § 75.372 ......................................................................................................3

45 C.F.R. §§ 88.2 ................................................................................................ 12, 13

58 Fed. Reg. 7462 (Feb. 5, 1993) ................................................................................3

65 Fed. Reg. 41,270 (July 3, 2000) ................................................................... 3, 4, 12

84 Fed. Reg. 7714 (Mar. 4, 2019) ...............................................................................4

86 Fed. Reg. 19,812 (Apr. 15, 2021) ...........................................................................3

86 Fed. Reg. 56,144 (Oct. 7, 2021) .....................................................................*passim*

89 Fed. Reg. 2078 (Jan. 11, 2024) .............................................................................13

Other Authorities

All-Options Talkline,
   https://www.all-options.org/find-support/talkline/ ...............................................6

HHS, Fiscal Year 2023 Title X Service Grant Awards,
   https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-
   grantees/fy2023-title-X-service-grant-awards .............................................. 17, 30

OPA, Title X Directory,
   https://opa.hhs.gov/sites/default/files/202402/Title_X_Directory_January_2024_
   508.pdf ..............................................................................................................26

States' Comment Letter ..............................................................................................22

**INTRODUCTION**

Through Title X of the Public Health Service Act (PHSA), Congress authorized the Department of Health and Human Services (HHS) to award discretionary grants to fund family planning services and to issue regulations defining the terms and conditions of such grants. In 2021, HHS issued a new rule (the 2021 Rule) that largely reinstated regulatory requirements that had been effective for much of the statutory program's history and that were in place without issue or legal challenge between 1993 and 2019. Thereafter, the Oklahoma State Department of Health (OSDH) accepted a Title X grant, which (like all Title X grants) was made expressly contingent on OSDH's compliance with applicable statutory and regulatory requirements, including the 2021 Rule's requirement that grantees provide nondirective options counseling to pregnant clients and a referral for any option chosen by the client, including for an abortion. When OSDH later refused to certify its compliance with these requirements and the terms of its Title X grant, HHS exercised its discretion and decided to terminate OSDH's Title X funding. This lawsuit contends that HHS's decision was unlawful, largely reflecting Oklahoma's belief that it need not follow the 2021 Rule's abortion referral provision. The Sixth Circuit, in a case brought by Oklahoma and other states, recently confirmed the permissibility of that requirement based on binding Supreme Court precedent. *See Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023). This Court should follow the *Ohio* court's decision and deny Oklahoma's motion for preliminary injunctive relief.

Oklahoma's claims are unlikely to succeed on the merits. HHS's decision is fully consistent with Title X and its implementing regulations as well as the Weldon Amendment, and Oklahoma's contrary arguments are largely foreclosed for the reasons relied on by the court in *Ohio*. Oklahoma's arbitrary-and-capricious claims fail because HHS provided a reasoned explanation for terminating OSDH's funding. And HHS's funding decision does

1

not pose any issue under the Spending Clause.  Finally, Oklahoma cannot demonstrate that it will suffer irreparable harm in the absence of emergency relief, and the public interest weighs against the imposition of such a drastic remedy.

## BACKGROUND

### I.    Title X

Title X authorizes the HHS Secretary "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects."  42 U.S.C. § 300(a).  The statute further requires that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate."  *Id.* § 300a-4(a).  HHS's implementing regulations afford it broad discretion to allocate congressionally-appropriated grant funds amongst competing applicants.  *See generally* 42 C.F.R. §§ 59.7, 59.8.  Each notice of grant award must specify "how long HHS intends to support the project without requiring the project to recompete for funds," *id.* § 59.8(a), but in general grants are initially awarded for a one-year period, *id.* § 59.8(b).  HHS also issues "continuation awards" which, while funded one year at a time, allow the recipient to receive continued support beyond the initial one-year period (typically for three to five years) without having to reenter the competitive funding process.  *See id.* § 59.8(a), (b).

Title X funds shall "be expended solely for the purpose for which the funds were granted in accordance with the approved application and budget" and generally applicable grant regulations.  42 C.F.R. § 59.9 (citing 45 C.F.R. part 75).  Those regulations, in turn, require grantees to document and report on their receipt and use of federal funds and authorize HHS to conduct audits to ensure compliance.  *See, e.g.*, 45 C.F.R. § 75.300(b) (providing that recipients are "responsible for complying with all requirements of the Federal

award"); 45 C.F.R. subpart D (setting forth post-award requirements, including controls for ensuring compliance and reporting on performance); 45 C.F.R. subpart F (setting forth audit requirements). If a recipient fails to comply with the terms and conditions of a grant— including any incorporated statutory or regulatory requirements—HHS can impose appropriate remedies, including termination. *See id.* §§ 75.371, 75.372.

## II.  Regulatory History and the 2021 Title X Rule

In accordance with its statutory mandate, *see* 42 U.S.C. § 300a-4(a), HHS has issued regulations defining requirements applicable to Title X grants. These regulations have at times offered differing interpretations of Section 1008 of the PHSA, which requires that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. But for much of the Title X program's history, the agency has required (as it does now) the provision of nondirective options counseling to pregnant clients (to include counseling on abortion if requested) and referral for abortion upon request.

The agency briefly changed course in 1988 and issued a rule that strictly "prohibited the discussion of or referral for abortion." 86 Fed. Reg. 19,812, 19,813 (Apr. 15, 2021). But while that interpretation was ultimately upheld by the Supreme Court as a permissible construction of § 1008, *Rust v. Sullivan*, 500 U.S. 173 (1991), the rule was "never implemented on a nationwide basis," 65 Fed. Reg. 41,270, 41,271 (July 3, 2000). In 1993, HHS suspended the 1988 Rule and imposed interim standards that reinstated the pre-1988 status quo. *See* 58 Fed. Reg. 7462 (Feb. 5, 1993) ("Under these compliance standards, Title X projects would be required, in the event of an unplanned pregnancy and where the patient requests such action, to provide nondirective counseling to the patient on options relating to her pregnancy, including abortion, and to refer her for abortion, if that is the option she selects."). HHS also

proposed new permanent regulations, which would ultimately be finalized in 2000. *See* 65 Fed. Reg. 41,270. The 2000 Rule adopted the 1993 interim standards that had been "used by the program for virtually its entire history." *Id.* at 41,271.

The regulatory requirements set forth in the 2000 Rule—which required nondirective pregnancy options counseling and counseling on and referral for abortion upon request—remained in effect without incident until 2019, when HHS issued a new rule similar to the 1988 version. *See* 84 Fed. Reg. 7714 (Mar. 4, 2019). The 2019 Rule significantly restricted the ability of Title X projects to provide pregnancy options counseling and prohibited Title X projects from referring for abortion. *Id.* In 2021, HHS revoked the 2019 Rule and replaced it with a new rule readopting, in substantial part, the 2000 Rule. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021). That rule again requires that Title X projects offer pregnant clients the opportunity to be provided information and counseling about available options, including "prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination." 42 C.F.R. § 59.5(a)(5). The project must provide neutral, factual information and nondirective counseling on each option and "referral upon request." *Id.*; *see also* 86 Fed. Reg. at 56,150 (explaining that an abortion referral may include "the name, address, telephone number, and other relevant factual information . . . about an abortion provider," and a Title X project cannot take "further affirmative action . . . to secure abortion services for the patient"). The Sixth Circuit, in a case brought by Oklahoma and eleven other states, recently found that the 2021 Rule's abortion referral requirement is a permissible interpretation of Title X and declined to award preliminary injunctive relief on that basis. *Ohio*, 87 F.4th at 772 ("it must be permissible for an administration to treat referrals either as falling inside or outside § 1008's prohibition").[1] The *Ohio* court determined that the Supreme Court's decision in *Rust*

---

[1] The *Ohio* litigation also involved another provision of the 2021 Rule not at issue here;

controlled and permitted the agency to adopt the abortion referral requirement.  *See id.* at 770 ("*Rust* remains binding precedent and controls here.").

In June 2022, the Supreme Court issued a decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which overturned prior precedent recognizing a constitutional right to abortion.  In the wake of that decision, HHS clarified that the abortion counseling and referral provisions of the 2021 Rule remained in effect, and that nondirective pregnancy options counseling (to include counseling on the option of abortion if requested), as well as abortion referrals upon request, were still required.  *See* OPA Q&A, Ex. A; June 29 OPA Letter, Ex. B.

## III.   Oklahoma's Title X Funding & HHS's Termination Decision

On March 23, 2022, HHS awarded a Title X project grant to the Oklahoma State Department of Health.  2022 Notice of Award (PI. Br., Ex. 5 at 9, ECF No. 23-5).  As the award explained, funding is provided one year at a time based on an annual application, the grantee's continued compliance with the grant's terms and conditions, and available appropriations.  *See generally id* at 1–17.  The award made clear that HHS is "not obligated to make additional Federal Funds available," *id*. at 3, and that Oklahoma "must comply with all terms and conditions outlined in the grant award," including requirements imposed by "program statutes and regulations, Executive Orders, and HHS grant administration regulations," *id*. at 4-5.  It also reiterated the requirement that Oklahoma provide quarterly financial and annual progress reports and submit to an annual audit.  *Id*. at 16.

A few months later, HHS's Office of Population Affairs (OPA) and OSDH began corresponding about OSDH's policy and procedure for providing nondirective options counseling and referral within its Title X project.  *See* May 24 OPA Letter at 1 (PI Br., Ex. 5

---

with respect to that provision, the Sixth Circuit determined that "the preliminary injunction factors weigh in favor of granting relief."  *Ohio*, 87 F.4th at 784.

at 33-34, ECF No. 23-5).  Specifically, on August 29, 2022, OSDH submitted a proposal to change its policy and procedure for providing nondirective options counseling and referral. *Id.*  On November 9, 2022, OPA informed OSDH that this proposal did not comply with the 2021 Rule, and therefore could not be approved.  *Id.*  OSDH submitted a request for reconsideration.  *Id.*  On January 25, 2023, OPA denied that request, but "informed OSDH that it could submit an alternate compliance proposal that included providing clients with referral to another entity, such as the All-Options Talkline." *Id.*; Jan. 25 OPA Letter to OSDH, Ex C.; Jan. 25 OPA Letter to Grantees, Ex. D; *see* All-Options Talkline, https://www.all-options.org/find-support/talkline/.   Shortly thereafter, OSDH submitted an alternative proposal for compliance, which included providing nondirective counseling on all pregnancy options by OSDH staff or through the All-Options Talk Line; OSDH submitted a revised policy in March 2023 reflecting this change.  May 24 OPA Letter at 1.  OSDH also submitted a written assurance of compliance with the options counseling and referral requirements in the 2021 Rule.  *Id.* at 24.  Based on this documentation, OPA determined that OSDH's policy complied with the Title X regulations. Accordingly, on March 30, 2023, OPA approved a continuation award for Oklahoma for an additional $4.5 million in Title X funding.  *See* 2023 Notice of Award at 1 (PI Br., Ex. 5 at 26-32, ECF No. 23-5).

However, on May 5, 2023, OSDH notified OPA by email that it "had a change required in our family planning program policy effective late afternoon of 4/27/2023."  May 24 OPA Letter at 2.  OSDH shared its changed policy, which no longer provided for counseling through and referral to the All-Options Talk Line, and provided that OSDH staff would "[p]rovide neutral, factual information and nondirective counseling on pregnancy options *in Oklahoma*" (rather than "on all pregnancy options," as stated in the prior iteration of the policy).  *Id.* at 1-2.  OPA determined that this new policy "d[id] not comply with the Title X

regulatory requirements and, therefore, the terms and conditions of [OSDH's] grant." *Id.* at 2. OPA referred the matter to the HHS Office of the Assistant Secretary for Health's Grants and Acquisitions ("GAM") division. *Id.*

On May 25, 2023, GAM notified OSDH that it was suspending OSDH's Title X award effective that day. *See* May 25 GAM Letter (PI Br., Ex. 5 at 36–37, ECF No. 23-5). On June 27, 2023, GAM notified OSDH that its Title X funding was terminated. *See* June 27 GAM Letter (PI Br., Ex. 5 at 1-8, ECF No. 23-5). OSDH appealed that determination administratively on July 27, 2023, *see* PI Br., Ex. 6, ECF No. 23-6, and the appeal remains pending.

**IV.    This Lawsuit**

Oklahoma filed its complaint on November 17, 2023, asserting four claims under the Administrative Procedure Act ("APA") and one claim pursuant to the Declaratory Judgment Act ("DJA"). ECF No. 1. Oklahoma moved for a preliminary injunction on January 26, 2024 and seeks a ruling on that motion no later than April 1, 2024. *See* Pls.' Mot. for Preliminary Injunction & Opening Brief in Support, ECF No. 23 (PI Br.).

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy," and therefore may only be awarded where the right to relief is "clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). This standard also applies to a request for a court to "postpone the effective date of an agency action" under 5 U.S.C. § 705. *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (collecting cases); *see* PI Br. 9 (requesting,

7

in the alternative, that the Court "postpone effectiveness of Defendants' action to terminate Oklahoma's Title X award pursuant to 5 U.S.C. § 705").[2]

## ARGUMENT

## I.    Oklahoma Is Not Likely to Succeed on the Merits.

### A.    HHS's Decision Is Authorized by Title X.

OPA's decision to terminate OSDH's Title X funding was based on the interpretation of § 1008 set forth in the 2021 Rule—*i.e.*, that Title X programs must provide, if requested, counseling on and referral for abortion.  Oklahoma contends that OPA's decision "violates Title X," PI Br. 14, because HHS's regulation "requiring abortion counseling and referrals is not within the bounds of reasonable interpretation" of § 1008 "and is therefore in excess of statutory authority granted by Congress," *id.* at 17; *see id.* at 18.  From a statutory perspective, the only relevant consideration is whether the interpretation set forth in the 2021 Rule is permissible.  And *Rust* establishes that it is, as recently explained by the Sixth Circuit in a case in which Oklahoma was a plaintiff.[3]

In *Ohio*, the Sixth Circuit held that *Rust* is controlling authority that § 1008 authorizes HHS to either forbid, permit, or require Title X programs to provide nondirective options counseling and, upon request, abortion counseling and referrals.  *Rust* rejected arguments that "providing counseling and referral for abortion is either necessarily treating, or not treating, 'abortion as a method of family planning,'" and thus, the *Ohio* court held, it "must be

---

[2] In any event, Oklahoma's request for relief in the form of postponement is moot because the termination decision is already effective, and Oklahoma alleges that, as of September 2023, "[f]unds that would previously have been directed to [OSDH] were instead apparently reallocated to" other Title X grantees.  Compl. ¶ 26.

[3] The distinction between facial and as-applied challenges makes no difference in this situation.  *See Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006) ("Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application).  Invariant, however, is the *substantive rule of law* to be used."  (emphasis in original)).

permissible for an administration to treat referrals" for abortion—and, necessarily, nondirective options counseling about abortion—"either as falling inside or outside § 1008's prohibition." *Ohio*, 87 F.4th at 771-72.  Accordingly, the Sixth Circuit concluded that "*Rust's* holding requires us to reject the States' [including Oklahoma's] argument that the 2021 Rule's referral requirement is contrary to law." *Id.* at 771.  Oklahoma does not provide any reason for this Court to reach a different conclusion regarding the legality of the counseling and referral requirement.

Oklahoma suggests that the statutory interpretation question should be analyzed anew to OPA's application of the 2021 Rule to OSDH because Oklahoma now generally prohibits "advising or procuring an abortion."  PI Br. 5; *see id.* 21–22.  But whatever restrictions Oklahoma law might now impose on abortion access, the statutory analysis is the same.  The 2021 Rule broadly and unequivocally requires that Title X providers "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding each" of their options— including "[p]regnancy termination"—and, if requested, to "provide neutral, factual information and nondirective counseling on each of the options, and referral upon request." 42 C.F.R. § 59.5(a)(5).  It does not refer to or incorporate state law.[4]  Nor does it limit the required counseling and referrals to procedures available within a particular state.  Thus, OPA simply applied the 2021 Rule's plain text to OSDH, determining that its policy of only providing pregnant clients with information and non-directive counseling on options "in Oklahoma" placed OSDH out of compliance.  *See* ECF No. 23-4, at 4.  This case does not

---

[4] Even before *Dobbs*, states could, and did, adopt abortion policies inconsistent with Title X regulations' broad counseling and referral provisions.  *See, e.g., Valley Family Planning v. North Dakota*, 661 F.2d 99, 102 (8th Cir. 1981) (finding state law prohibiting Title X grantees from making abortion referrals was preempted by the Supremacy Clause).  These federal regulatory provisions were in effect for nearly the entire history of the Title X program, and yet Defendants are not aware of any example of a state entity seeking an exception from the plain text of the governing regulation on the basis of conflicting state law.

involve OPA applying any new interpretation of Title X or its regulation to OSDH; it involves OSDH adopting a contrary interpretation and attempting to force it on the agency. *Cf., e.g., Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663-64 (D.C. Cir. 1983) ("It is elementary that under the Supremacy Clause . . . states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing federal statutory or regulatory scheme."); *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 337 (5th Cir. 2005) ("[A] state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause."). Under *Rust* and *Ohio*, it is the agency's interpretation which controls,[5] not OSDH's.

Title X establishes a competitive grant program that subjects all grantees to program requirements set forth in agency regulations. *Rust* and *Ohio* establish the permissibility of the abortion counseling and referral provisions relied upon by OPA in the decision challenged here. State entities that wish to receive federal Title X funds can either choose to follow those provisions or they can choose to decline the funds. *Cf. Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."). But Congress wrote no exceptions into Title X based on state abortion laws—even at a time when most states prohibited abortions.

---

[5] Those cases also plainly establish that HHS's interpretation is entitled to *Chevron* deference. *See Ohio*, 87 F.4th at 770-72 (discussing *Chevron* analysis under *Rust*). HHS's application of the 2021 Rule's counseling and referral provisions to OSDH is entitled to the same *Chevron* deference. *See, e.g., City of Arlington, Tex. v. FCC*, 569 U.S. 290, 306 (2013) (*Chevron* deference applies where Congress vests the agency with "general authority to administer the [statute] through rulemaking *and adjudication*, and the agency interpretation at issue was promulgated in the exercise of that authority" (emphasis added)); *Montford and Co. v. SEC*, 793 F.3d 76, 82 (D.C. Cir. 2015).

**B.     HHS's Decision Does Not Violate the Weldon Amendment.**

Oklahoma also argues that the 2021 Rule, or OPA's application of it to OSDH, violates the Weldon Amendment.  The Weldon Amendment is a statute meant to protect health care entities who object to *providing* abortion services or related referrals.  It states that no Appropriations Act funds can be provided to "a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortion."  *E.g.* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, title V, § 507(d)(1), 136 Stat. 49,496 (Mar. 15, 2022) (the Weldon Amendment is a rider for every HHS Appropriations Act). Oklahoma argues that the 2021 Rule requires states to discriminate against objecting providers in violation of the Weldon Amendment.  PI Br. 16.  This argument is meritless.

As an initial matter, nothing in Oklahoma's Complaint discusses or even mentions the Weldon Amendment.  The Court cannot entertain a motion for preliminary injunction on a claim not raised in the Complaint.  *See Clay v. Okla. Dep't of Corr.*, No. CIV-12-1106-C, 2013 WL 3058122, at *2 (W.D. Okla. June 17, 2013) ("When the movant seeks intermediate relief beyond the claims in the complaint, the court is powerless to enter a preliminary injunction."); *see also Castellano v. Choinski*, No. 3:07-cv-772, 2008 WL 749857, at *2 (D. Conn. Mar. 19, 2008) (citing *De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945)).

In any event, Oklahoma's argument misunderstands the Weldon Amendment's application to Title X.  Under Title X, the requirement to refer for abortions upon request is on the "project," not on subrecipients. *See* 42 C.F.R. § 59.5(a)(5)(ii) ("Each *project* supported under this part must . . . [n]ot provide abortion as a method of family planning.  A *project* must . . . [i]f requested to provide such information and counseling, . . . referral upon request

[for pregnancy termination]." (emphasis added) (footnote omitted)). For example, just as not every service site must offer all methods of family planning as long as the "project" does, not every subrecipient must offer referral for abortions as long as the project does. *See id.* § 59.5(a)(1) ("If an organization offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of acceptable and effective medically approved family planning methods and services."); *see also* 2021 Rule, 86 Fed. Reg. at 56,153 ("[O]bjecting providers or Title X grantees are not required to counsel or refer for abortions."); 42 C.F.R. § 59.5(a)(5) n.2 ("Providers may separately be covered by federal statutes protecting conscience and/or civil rights."); *Ohio*, 87 F.4th at 774. Because the 2021 Rule's referral requirement is not imposed on individual providers or subrecipients, who may claim objector status, but on the "project" (here, OSDH), OSDH can still comply with the referral requirement without discriminating against objecting providers.[6] *Contra* PI Br. 16 (incorrectly asserting that the 2021 Rule "forbids Oklahoma from sub-granting to health care entities that will not refer for abortion").

Oklahoma also claims that OSDH qualifies as a "health care entity," PI Br. 15 (citing 45 C.F.R. § 88.2), seemingly suggesting that it can be considered an objector under the Weldon Amendment. But this argument cannot be squared with the text of the Weldon Amendment. For purposes of the Weldon Amendment, the term "health care entity" "includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." *E.g.* Consolidated Appropriations Act, 2022, Pub. L.

---

[6] The 2000 Rule, which also required abortion referrals upon request, contained a similar protection based on other conscience statutes prior to Congress adopting the Weldon Amendment in 2004. *See* 65 Fed. Reg. at 41,274 ("[G]rantees may not require individual employees who have such [conscience] objections to provide such counseling. However, in such cases the grantees must make other arrangements to ensure that the service is available to Title X clients who desire it.").

No. 117-103, div. H, title V, § 507(d)(2), 136 Stat. 49,496 (Mar. 15, 2022).   OSDH is a department of state government, not a "health care facility, organization, or plan" or any of the other entities listed in the statute.[7]

### C.   HHS's Decision Is Consistent with Agency Regulations.

Next, Oklahoma contends that HHS's decision to terminate OSDH's funding "unreasonably interprets its own regulations," citing other provisions that the decision allegedly contradicts.  PI Br. at 19.  But an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and Oklahoma has identified no such deficiency here.

First, Oklahoma misunderstands 42 C.F.R. § 59.5(b)(6), which requires that each Title X project affirm that "family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning."  By its terms, that regulatory provision does not limit the scope of pregnancy options counseling, or accompanying referrals, that must be provided pursuant to subsection 59.5(a).  Rather, the language on which Oklahoma focuses was added to the 2021 Rule in response to comments advocating to expand the individuals permitted to direct Title X projects from physicians to

---

[7] Oklahoma's attempt to rely on the definition of "health care entity" in 45 C.F.R. § 88.2, PI Br. 15, fails.  That regulation, and the broader rule of which it was a part, have been vacated by multiple courts. *See New York v. HHS*, 414 F. Supp. 3d 475, 524–25 (2019) (citing Congressional remarks of Representative Weldon and holding: "The Rule's definition of this term[, health care entity,]—which appears in the Coats-Snowe and Weldon Amendments and the ACA—extends beyond what the face of these statutes disclose."); *see also, Washington v. Azar,* 426 F. Supp. 3d 704 (E.D. Wash. 2019) (vacating rule); *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001 (N.D. Cal. 2019) (same).  HHS has also rescinded the regulation. *See* Safeguarding the Rights of Conscience as Protected by Federal Statutes, 89 Fed. Reg. 2,078 (Jan. 11, 2024).

"a broader range of healthcare providers." 86 Fed. Reg. at 56,163.  The reference to state law merely incorporated state definitions of the authority of physician assistants and other similar providers to direct family planning programs. *See id.* at 56,164 (explaining that HHS was adopting a definition of "clinical services provider" that includes "physicians, physician assistants, nurse practitioners, certified nurse midwives, and registered nurses with an expanded scope of practice who are trained and *permitted by state-specific regulations to perform*" Title X services (emphasis added)).  It did not give state law veto power over all other Title X regulatory requirements.

Oklahoma's second argument similarly misreads the plain language of the Title X regulation.  HHS requires that each project affirm that it will "[p]rovide for coordination and use of referrals and linkages" with various health care providers.  42 C.F.R. § 59.5(b)(8).  These "referrals and linkages" should be with providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." *Id.*  The regulation simply provides that Title X projects should attempt, *where feasible*, to make referrals to nearby healthcare providers.  Where such close-in-proximity referrals are not feasible, providers are not prevented from making referrals to more distant entities.  There is no conflict between this regulatory provision and the challenged HHS decision, which is based on subsection 59.5(a)(5)'s broad requirement that projects provide nondirective options counseling and appropriate referrals upon request.  HHS recognized that this might require projects in states with restrictive abortion laws to refer out of state, but left it to the projects to ensure compliance, including by using telehealth and hotline options.  But because subsection 59.5(b)(8) does not impose any limitation on a project's ability to provide referrals to providers that are not in close proximity to the site, Oklahoma has identified no conflict between the challenged decision and HHS's broader Title X regulations.

###### D.    HHS's Decision Is Neither Arbitrary Nor Capricious.

Oklahoma's arbitrary-and-capricious claims fare no better.  Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for the action including a rational connection between the facts found and the choice made."  *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (citation omitted).  A court's review is "narrow" and it "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Oklahoma raises several arguments that OPA's termination decision was arbitrary and capricious.  PI Br. 20–23.  None of these arguments succeed.

Oklahoma first argues that the termination decision is arbitrary and capricious because "Congress clearly intended its Title X funding *not* to go to promoting or performing abortions in any way."  *Id.* at 21.  This argument is duplicative of Oklahoma's statutory arguments.  *See supra* Part I.A–B.  The abortion referral requirement of the 2021 Rule does not violate any statute, so OPA's termination decision relying on that rule is not arbitrary and capricious.

Oklahoma next argues that OPA discontinued OSDH's grant without considering "the impact of requiring States where abortion is prohibited to comply with counseling and referral requirements."  PI Br. 21; *see also id.* (arguing that "federalism concerns were overlooked").  Oklahoma is incorrect.  As an initial matter, OPA's decision is a straightforward application of the valid requirements of the 2021 Rule.  *See supra* Part I.A; *Ohio*, 87 F.4th at 772 (applying *Rust*).  Because that rule requires grantees to provide abortion referrals upon request, OPA

15

declined to continue funding OSDH's grant when OSDH would not certify that it would do so.  An agency does not act in an arbitrary and capricious manner merely by applying a valid regulation.  Oklahoma's argument is really a backdoor attempt at challenging the referral requirement of the 2021 Rule—a challenge that was already rejected in the *Ohio* case, to which Oklahoma was a party.

In any event, the agency has provided a valid explanation for its decision that takes into account the fact that certain states have limited access to abortion.  In June 2022, HHS issued guidance that clarified the requirements of the Title X program post-*Dobbs*, including in states that limited access to abortion in the immediate wake of the *Dobbs* decision. *See* OPA Q&A, Ex. A.  This document states that the abortion counseling and referral provisions of the 2021 Rule remain in effect, and that nondirective pregnancy options counseling (to include counseling on the option of abortion if requested), as well as abortion referrals upon request, is still required. *Id.* at 4–5.  The document also notes that "[t]here are no geographic limits for Title X recipients making referrals for their clients," and that "Title X recipients have flexibility to refer clients for services across state lines if necessary." *Id.* at 5.  HHS also clarified that counseling and referrals may be made in person or via telehealth. *Id.*  In deciding to terminate OSDH's funding, OPA further confirmed that Title X projects are required to "provide information and nondirective counseling on a range of options, including . . . referrals upon client request, including referrals for abortion," and that "in some circumstances, those referrals will need to be made out of state."  ECF No. 23-4, at 4; *see also* May 24 OPA Letter at 1 (PI Br., Ex. 5 at 33-34, ECF No. 23-5) (noting that OPA "informed OSDH that it could submit an alternate compliance proposal that included providing clients with referral to another entity, such as the All-Options Talkline").  This explanation demonstrates that HHS considered the issue of state-law limitations on abortion access and nonetheless decided that

16

the still-in-force referral requirements of the 2021 Rule should be applied as written. "As long as the agency's explanation is clear enough that its path may reasonably be discerned, we must respect its policy choice." *Ohio*, 87 F.4th at 775 (citations omitted).

Oklahoma raises several specific points that it says OPA should have considered and did not address in its decision, although notably Oklahoma does not say whether it raised any of these issues with the agency prior to this lawsuit.[8] *See Teufel v. Dep't of the Army*, 608 F. App'x 705, 706 n.2 (10th Cir. 2015) ("Ordinarily, appellate courts refuse to consider issues not raised before an administrative agency." (quoting *Wallace v. Dep't of Air Force*, 879 F.2d 829, 832 (Fed. Cir. 1989))). First, pointing to OPA's 2016 program review of OSDH, Oklahoma argues that family planning services in the state will be reduced if OSDH does not have a Title X grant. PI Br. 22. But OSDH is not the only Title X grantee or the only project capable of providing family planning services in the state. *See* HHS, Fiscal Year 2023 Title X Service Grant Awards, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (noting three Title X grantees, not including OSDH, operating in the State of Oklahoma). Moreover, some of Title X's 2023 funds have been redistributed to other grantees to serve Oklahoma now that OSDH has refused to comply with HHS regulations. *See* Compl. ¶ 26 (alleging that OPA has already reallocated some funds). In any event, the Court should not second-guess OPA's decision to terminate an award to a grantee that fails to comply with applicable regulations. *Ohio*, 87 F.4th at 775 ("[I]t is not the role of the court to 'second guess the analysis and policy judgments that undergird the agency's regulations.'" (citation omitted)).

Oklahoma also says that it is "heavily invested in providing services described in

---

[8] Oklahoma also did not raise any of these concerns during the notice-and-comment period for the 2021 Rule. To the extent Oklahoma attempts to challenge the 2021 Rule—which OPA's decision merely applies—such arguments are waived. *See Mich. Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000).

Title X, given Oklahoma's 40-year track record of administering the Title X program," and that "Oklahoma's citizens are heavily invested in receiving those services."  PI Br. 22.  But Oklahoma has no legally cognizable interest in the continued receipt of Title X funding.  Title X grants only obligate HHS to provide funds to the grantee for one year (while sometimes providing HHS with the option of issuing noncompetitive continuation grants for additional years), 42 C.F.R. § 59.8(b), and HHS's Title X regulations provide that "[n]either the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application," *id.* § 59.8(c).  The termination decision here concerns only discretionary funding.  *Cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2484 (2018) (discounting asserted reliance interests because the relevant "contract provisions . . . will expire on their own in a few years' time").  Moreover, the referral requirement has been in effect since at least 2021, and for decades prior to the 2019 Rule, and Oklahoma abided by that requirement in accepting grants prior to 2023.  Oklahoma thus cannot claim that it now has a reliance interest in receiving grants without needing to comply with the referral requirement.

Finally, Oklahoma contends that OPA unlawfully "shifted positions" by terminating OSDH's Title X grant.  PI Br. 22–23.  This argument misses the mark because the referral requirement has been in force since the 2021 Rule was issued and the agency has never changed its position on what the Rule requires.  Instead, HHS has consistently applied that requirement.  *See generally* OPA Q&A at 3, 5.  The referral requirement is an outgrowth of the nondirective counseling requirement, *see* 86 Fed. Reg. at 56,149–50, and is consistent with medical ethics dictating that a pregnant client be provided with information about all options available to her; that need for neutral, accurate information does not change merely because

some states have limited access to certain services.  Oklahoma argues that OPA's decision contradicts the 2021 Rule's provision that "objecting providers or Title X grantees are not required to counsel or refer for abortions."  86 Fed. Reg. at 56,153; *see* PI Br. 22.  That exception is an application of conscience and religious freedom statutes.  *See* 86 Fed. Reg. at 56,153.  A state agency cannot claim to be an objector under those statutes.[9]  HHS has not been inconsistent on this point.

### E.    Notice-and-Comment Procedures Were Not Required.

Oklahoma also briefly argues that HHS's termination decision violated the APA's procedural requirements because "HHS's termination of Oklahoma's Title X funding amounts to a legislative rule that required notice and comment."  PI Br. at 23.  But this argument provides no independent basis for invalidating the decision because, as explained above, *supra* Part I.A, that decision merely applies the plain language of the 2021 Rule to Oklahoma.  *See, e.g.*, *Otsuka Pharm. Co. v. Burwell*, 302 F. Supp. 3d 375, 409 (D.D.C. 2016) (rejecting similar argument and holding that notice-and-comment procedures are not required so long as challenged agency adjudication is a "clarification or interpretation of the existing rules" rather than a "'de facto' amendment of a duly promulgated regulation") (citation omitted); *see also Blanca Tel. Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014) (holding that "adjudicatory decisions are not subject to the APA's notice-and-comment requirements"); *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1223 (10th Cir. 2009) (holding that the challenged agency action was "an interpretative rule, and the [agency] was not required to comply with notice and comment procedures").

---

[9] Providers who work for state grantees may, in some instances, qualify for objector status.  *See* 42 C.F.R. § 59.5(a)(5) n.2 ("*Providers* may separately be covered by federal statutes protecting conscience and/or civil rights."  (emphasis added)).

**F.      HHS's Decision Does Not Implicate the Spending Clause.**

"Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022); *see also Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Oklahoma argues that OPA's decision to terminate its Title X funding violates the Spending Clause because, in Oklahoma's view, that decision "was based on a requirement that was not congressionally mandated and that Oklahoma never knowingly and voluntarily accepted." PI Br. 12. But Oklahoma's argument incorrectly frames the issue and erroneously relies on *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1 (1981), and the Sixth and Eleventh Circuit's recent *Pennhurst* decisions (*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), and *W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023)), none of which involved the type of challenge contemplated here.

*Pennhurst* and its progeny reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. Just as with actual contractual obligations, a state must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Id.* For that reason, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Congress cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Id.* at 25; *see also Nat'l Fed. of Indep. Business v. Sebelius*, 567 U.S. 584 (2012).

Courts have applied the *Pennhurst* rule by relieving states of the obligation to comply with statutory conditions on federal funding that were not sufficiently apparent at the time of acceptance. In *Pennhurst* itself, for example, the question was whether the "bill of rights" provision of a federal statute stated an enforceable condition at all, or whether it was merely

"hortatory."  451 U.S. at 15-27. Construing the statute, the Court found it "clear that the provision[]" was "intended to be hortatory, not mandatory," *id.* at 24, and thus foreclosed the plaintiffs' effort to enforce it against the state defendant.  In *West Virginia* and *Kentucky*, likewise, the question was whether the plaintiff states could "ascertain" a condition that a federal statute placed on their expenditure of federal grant funds.  *West Virginia*, 59 F.4th at 1140; *see Kentucky*, 54 F.4th at 348.

This case differs in significant respects from *Pennhurst* and its progeny.  First, *Pennhurst*, *Kentucky*, and *West Virginia* all dealt with allegedly ambiguous *statutory* funding conditions. None of those cases involved the situation here—*i.e.*, where a statute creates a federal grant program and unambiguously makes such grants subject to conditions set forth in agency regulations.  Oklahoma is not challenging any aspect of Title X itself but is instead challenging HHS's application of the unequivocal counseling and referral provisions in the 2021 Rule, which were just upheld by the Sixth Circuit.  *See* PI Br. 11 (arguing that the referral requirement "was wholly absent from Congress's statutory regime").  None of the cases cited by Oklahoma supports the notion that the Spending Clause can be used to challenge an agency's application of such a regulation to terminate a discretionary grant.

Even if *Pennhurst* did apply, it would present no obstacle to the decision at issue in this case.  Most importantly, *Pennhurst*'s notice requirement—*i.e.*, that a statute authorizing the provision of federal funds must "provid[e] clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with [the conditions]," *Pennhurst*, 451 U.S. at 24-25—is met here.  Title X is clear that "[g]rants and contracts . . . shall be made in accordance with such regulations as the Secretary may promulgate," 42 U.S.C. § 300a-4(a), and "shall be . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.*

§ 300a-4(b).  Thus, states—as all other Title X recipients—are aware that, once they accept Title X funding, they must comply with the requirements set forth by the Secretary.  Those requirements include the 2021 Rule, which requires Title X grantees to provide non-directive counseling and referrals for abortion.  Oklahoma's contention that it "never knowingly and voluntarily accepted" this condition of funding, PI Br. 12, cannot be squared with the fact that the 2021 Rule was promulgated months prior to Oklahoma receiving its Title X grant in 2022, *see* 86 Fed. Reg. at 56,144.  Indeed, Oklahoma both submitted a comment on the proposed rule in May 2021, *see* States' Comment Letter at 15, and filed a lawsuit challenging the 2021 Rule in October 2021, *see* Compl., *Ohio v. Becerra*, No. 1:21-cv-675 (N.D. Ohio Oct. 25, 2021), ECF No. 1, and yet still applied for and accepted Title X funding with full knowledge that the 2021 Rule was in force.  Oklahoma's claim that it lacked sufficient notice of these conditions is particularly unpersuasive given that the Title X program has required non-directive counseling on all options, including abortion, for most of the program's existence, *see supra* pp. 3–4, and Oklahoma has nevertheless accepted such funding "[f]or nearly half a century," Compl. ¶ 1.[10]

Oklahoma contends that the statute's silence with respect to abortion counseling, referral, or advocacy prohibits the Secretary from imposing any conditions related to such activity, notwithstanding Congress's express assertion that Title X grants shall be "subject to such conditions as the Secretary may determine to be appropriate."  PI Br. 11–12.  Presumably, then, Oklahoma would argue that *any* conditions imposed by the Secretary that are not expressly addressed in detail in a statute are invalid and unenforceable.  But it is not unusual

---

[10] *Cf. Gruver v. La. Bd. of Supervisors*, 959 F.3d 178, 184 (5th Cir. 2020) (rejecting Spending Clause claim when the challenged provision "has been on the books for over thirty years, all the while LSU has continued to accept federal funding"); *Miss. Comm'n on Envtl. Quality v. E.P.A.*, 790 F.3d 138, 179 (D.C. Cir. 2015) (noting that a state's prior acceptance of federal funding despite the challenged condition "may be an additional relevant factor . . for assessing the constitutionality of Spending Clause legislation.").

or impermissible for Congress to authorize an agency to promulgate requirements on federal funding.  The Supreme Court has long established that, once Congress makes clear that a condition on the use of federal funds is mandatory and enforceable, it may leave the particulars of implementing the condition to the agency charged with administering the spending program.  In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), for example, the Court held that the Department of Education should evaluate a state's compliance with conditions on federal funds by looking to "the statutory provisions, regulations, and other guidelines provided by the Department at that time." *Id.* at 670.  And in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam), the Supreme Court considered whether a statute delegating broad authority for the HHS Secretary "to promulgate, as a condition of a facility's participation in the [Medicare and Medicaid] programs, such 'requirements as [he] finds necessary in the interest of health and safety of individuals who are furnished services in the institution,'" *id.* at 90 (quoting 42 U.S.C. § 1395x(e)(9)), allowed the Secretary to require Medicare and Medicaid providers to mandate COVID-19 vaccinations for their employees.  The Court found that it did, recognizing the wide array of conditions and requirements imposed on Medicare and Medicaid facilities under that authority.[11]  *Id.* at 92-96.

Here, as in *Missouri*, the condition articulated in the statute is perfectly clear:  Title X recipients must follow conditions prescribed by the agency.  As the Supreme Court has historically recognized, when operating a grant program, "the Federal Government simply [cannot] prospectively resolve every possible ambiguity concerning particular applications of the requirements of" the underlying statute.  *Bennett*, 470 U.S. at 669; *see also Mayweathers v.*

---

[11] In *Missouri*, the states argued that they could not be subjected to the COVID-19 vaccination requirement because it was not articulated in the statute.  *See* Resp. to Application for a Stay Pending Appeal, *Becerra v. Louisiana*, Nos. 21A240, 21A241, 2021 WL 8939385, at *26-27 (U.S. Dec. 30, 2021) (citing *Pennhurst*, 451 U.S. at 17); Resp. to Application for a Stay, *Biden v. Missouri*, No. 21A240, 2021 WL 8946189, at *23-24 (U.S. Dec. 30, 2021) (citing *Arlington Cent.*, 548 U.S. at 296).

*Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible").  This is particularly true where, as here, "grant recipients had an opportunity to seek clarification of the program requirements" from the agency. *Bennett*, 470 U.S. at 669.  As explained above, the 2021 Rule clearly sets out conditions that recipients must follow to receive Title X funding.  And those conditions were plainly ascertainable when Oklahoma applied for its initial grant in 2022 and when HHS terminated its funding in 2023.

Oklahoma cites to an Eleventh Circuit case, *West Virginia*, to support its argument that an agency cannot impose a condition that is not set forth unambiguously in a statute.  *See* PI Br. 11.  But even the *West Virginia* court recognized that "when a state accepts federal funds, the state necessarily agrees 'to comply with, and its liability determined by, the legal requirements in place when the grants were made,'" and that "[t]hese 'legal requirements' include existing regulations." *W. Virginia*, 59 F.4th at 1148 (quoting *Bennett*, 470 U.S. at 670); *see also id.* ("To be clear, we do not question an agency's authority to fill in gaps that may exist in a spending condition.").

As noted above, this case does not present the type of Spending Clause issue addressed in *West Virginia*.  And, in any case, the *West Virginia* case is clearly distinguishable from this one.  In *West Virginia*, states challenged a provision in the American Rescue Plan Act ("ARPA"), which set aside $195.3 billion in stimulus funds to be distributed to states and the District of Columbia to combat the economic challenges posed by the COVID-19 pandemic, but conditioned receipt of those funds on states certifying that they would comply with ARPA's "offset provision." 59 F.4th at 1132-3.  The offset provision provided that states could not use ARPA funds to "directly or indirectly offset a reduction in [their] net tax

revenue" resulting from "a change in law that 'reduces any tax.'"  *Id.* at 1132 (quoting 42 U.S.C. § 802(c)(2)(A)).

ARPA and the offset provision differ in several important respects from Title X and the referral requirement at issue here.  *First*, Title X directly authorizes the Secretary to impose conditions on Title X grant funding, whereas ARPA contained no such language.  *Compare* 42 U.S.C. § 300a-4(b) (providing that grants shall be "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made"), *with* 42 U.S.C. § 802(f) (providing that "[t]he Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section").  Accordingly, Title X expressly put states on notice that grants would be subject to conditions set by the Secretary, including the conditions set forth in the 2021 Rule.[12]

*Second*, the Eleventh Circuit's decision in *West Virginia* turned at least in part on ARPA's "novelty and scope," *W. Virginia*, 59 F.4th at 1145–46, neither of which are issues here.  There is no "lack of historical precedent" here, where the Title X program has required nondirective counseling and referrals for approximately four decades (with two short-lived exceptions).  And while ARPA "aimed [a] novel restriction at each state's *entire* budget and every single one of its taxes," the amount of funding at issue here—approximately $4.5 million, *see* 2023 Notice of Award at 1—is a much more modest sum, affecting only one specific state program.

Oklahoma's repeated references to state sovereignty cannot save its Spending Clause claim.  Oklahoma's brief seems to suggest that there is some heightened version of the Spending Clause that applies where unspecified "sovereign interests" are at stake, but that is

---

[12] Oklahoma's reliance on *Colorado v. United States Department of Justice*, 455 F. Supp. 3d 1034 (D. Colo. 2020), is inapposite for the same reason.  That case involved a formula grant program, "meaning that Congress has already 'determine[d] who the grant recipients are and how much money each shall receive.'"  *Id.* at 1047 (citation omitted).  The statute in question authorized the Attorney General to "issue rules to carry out this part," *see* 34 U.S.C. § 10155, which is more limited than the grant of power in Title X.

not what the Sixth Circuit meant when it said that "[a]s *Pennhurst* and other precedents recognize, more is at stake when Congressional spending legislation threatens state sovereign interests *than is at issue in a run-of-the-mill private contract dispute*." *Kentucky v. Yellen*, 67 F.4th 322, 327 (6th Cir. 2023) (emphasis added).  In other words, the Sixth Circuit was merely pointing out that cases implicating the Spending Clause may also implicate state sovereign interests.  But as explained above, HHS's decision does not violate the Spending Clause.  Thus, it makes no difference which sovereign interests Oklahoma believes are implicated here.

Separately, Oklahoma suggests that HHS terminated the state's Title X funding "on the basis of its abortion laws," but that is simply not accurate.  HHS terminated the state's Title X funding—after several attempts to reach a viable compromise—due to its noncompliance with the Title X regulations at 42 C.F.R. § 59.5(a)(5).  *See* May 24 OPA Letter at 1–2.[13]  Requiring Oklahoma to follow the regulations that it agreed to follow in exchange for discretionary funding is not an intrusion of state sovereignty.  As the Supreme Court has explained, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."  *Agency for Int'l Dev.*, 570 U.S. at 214.  Oklahoma also tries to attack HHS's decision to award supplemental funds to another entity, the Missouri Family Health Council, but that is of no moment here.  The Spending Clause does not authorize a state to challenge the federal government's decision to grant discretionary funds to a nonprofit organization.

## II.  Oklahoma Has Not Demonstrated Irreparable Harm.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.  Among other things, a movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief."  *Id.* at 20, 22.  Oklahoma fails to

---

[13] HHS has not terminated grants to other states whose laws severely restrict access to abortion, where those states continue to comply with Title X regulations.  *See* https://opa.hhs.gov/sites/default/files/202402/Title_X_Directory_January_2024_508.pdf.

demonstrate an injury that is "both certain and great," and not "merely serious or substantial." *See also Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (citation omitted); *see also Prairie Band of Potawaomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). In examining the preliminary injunction factors, "courts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video Satellite, Inc.*, 356 F.3d at 1260–61 (alteration in original) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

Oklahoma dedicates only one short paragraph to irreparable harm, and none of its arguments are persuasive. *First*, Oklahoma claims that it will be irreparably harmed by not receiving Title X funding for fiscal year 2024, which it describes as a "loss of funding." PI Br. 24. "[E]conomic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). And while "[t]he federal government's sovereign immunity typically makes monetary losses . . . irreparable," *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. Jan. 12, 2023), courts have recognized that "a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be 'great,'" *Ohio v. Becerra*, 577 F. Supp. 3d 678, 699 (S.D. Ohio 2021), *aff'd in part, rev'd in part and remanded*, 87 F.4th 759 (6th Cir. 2023) (quoting *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)); *see also, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (collecting cases); *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) (similar). "Otherwise, a litigant seeking injunctive relief against the

government would always satisfy the irreparable injury prong, nullifying that requirement in such cases." *CoverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

Although Oklahoma does not provide financial information in its brief, the annual amount OSDH receives through Title X funding likely represents a tiny fraction of the state's total annual budget.  As such, Oklahoma has not met its burden of showing that even the loss of a year's funding would be so great as to constitute irreparable harm.

Oklahoma contends that not receiving Title X funding will "jeopardize[] Oklahoma's ability to continue offering services through the Health Department" and will cause the state to lose "its investment in translation and language services."  PI Br. 24.  Oklahoma's brief contains no other reference to or explanation of "translation and language services."  *But see* Compl. ¶ 55.  In any event, and as explained above, *see supra* Part I.D, Oklahoma has no legally cognizable interest in the continued receipt of Title X funding.  Title X grants only obligate HHS to provide funds to the grantee for one year (while sometimes providing HHS with the option of issuing noncompetitive continuation grants for additional years), 42 C.F.R. § 59.8(b), and HHS's Title X regulations provide that "[n]either the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application," *id.* § 59.8(c).  Additionally, Oklahoma's argument that OSDH will not be able to continue offering family planning services depends on the assumption that the Oklahoma Legislature will not step in to fill the funding gap.

*Next*, Oklahoma cursorily cites its "potential loss [of] future grant funding that totals $541.2 million."  PI Br. 24.  But Oklahoma's argument ignores that it requests *preliminary* relief, and so the question is whether Oklahoma will be irreparably harmed during the pendency of litigation—not over the course of several years.  As such, Oklahoma's focus on the funding

that it anticipated over its original project period (i.e., until 2027) is mistaken.  Moreover, Oklahoma provides no evidence supporting its $541.2 million estimate; the declaration to which Oklahoma's brief cites says that "OSDH currently receives approximately $541.2 million from over 90 other federal grant programs *outside of Title X*."  ECF No. 23-1, ¶ 29 (emphasis added).

*Finally*, Oklahoma cursorily states that "[a]dditional impacts include Oklahoma's ability to access the federal discount pharmacy program," PI Br. 24.  Oklahoma provides no explanation of this anywhere in their brief, or in the Complaint, so Defendants have no real opportunity to respond to this point.  Oklahoma's argument should be deemed waived for lack of development.

## III.    The Public Interest Weighs Against a Preliminary Injunction.

The balance of hardships and the public interest weigh against issuing an injunction here. When the government is a party, these two inquiries merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). Oklahoma insists that an injunction would not harm HHS because "an injunction would only preserve the status quo in effect before HHS terminated Oklahoma's funding," PI Br. 24, but that argument ignores that "[t]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop," *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev.*, No. 14-1823-RMW, 2014 WL 2192052, at *3 (N.D. Cal. May 23, 2014).  HHS had the authority to issue the 2021 Rule, *Ohio*, 87 F.4th at 772, and the agency determined that its counseling and referral provisions were in the public interest. An injunction frustrating the enforcement of the 2021 Rule would therefore harm the agency and the public interest.  Moreover, an injunction would change the status quo with an impact on patients because OSDH was providing abortion referrals upon request prior to the

state's policy change that promptly led to the grant termination.  And despite Oklahoma's suggestion otherwise, *see* PI Br. 25, other Title X grantees are capable of providing family planning services within the state and filling any gaps left by the discontinuation of Oklahoma's grant,  *see*  https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (noting three Title X grantees, not including OSDH, operating in the State of Oklahoma). Presumably whatever relief Oklahoma wants from HHS would require funding OSDH at the expense of funding another grantee, so a preliminary injunction would go beyond merely preserving the status quo.

## CONCLUSION

For the foregoing reasons, the Court should deny Oklahoma's preliminary injunction motion.


DATED: February 23, 2024          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

/s/ *Michael P. Clendenen*
MICHAEL P. CLENDENEN
ALEXANDRA R. SASLAW
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:  (202) 305-0693
E-mail:  michael.p.clendenen@usdoj.gov

*Counsel for Defendants*