```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    WESTERN DISTRICT OF OKLAHOMA

 3
     STATE OF OKLAHOMA,              )
 4                                   )
          Plaintiff,                 )
 5                                   )
     vs.                             )  Case No. CIV-23-1052-HE
 6                                   )
     UNITED STATES DEPARTMENT OF     )
 7   HEALTH AND HUMAN SERVICES,      )
     et al.,                         )
 8                                   )
          Defendants.                )
 9

10                      *  *  *  *  *  *  *

11                   TRANSCRIPT OF PROCEEDINGS

12              BEFORE THE HONORABLE JOE HEATON

13                 UNITED STATES DISTRICT JUDGE

14                      MARCH 26, 2024

15                      AT 1:30 P.M.

16            MOTION FOR PRELIMINARY INJUNCTION

17                   *  *  *  *  *  *  *

18

19

20

21

22

23

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
25
```

```
1                     A P P E A R A N C E S

2    For the Plaintiff:

3         Mr. R. Tom Hillis
          Mr. Barry G. Reynolds
4         Mr. J. Miles McFadden
          Titus Hillis Reynolds Love
5         15 East Fifth Street, Suite 3700
          Tulsa, Oklahoma 74103
6
          Mr. Anthony J. Ferate
7         Spencer Fane
          9400 N. Broadway Extension, Suite 600
8         Oklahoma City, Oklahoma 73114

9         Ms. Audrey A. Weaver
          Oklahoma Office of the Attorney General
10        313 NE 21st Street
          Oklahoma City, Oklahoma 73105
11

12   For the Defendants:

13        Mr. Michael Patrick Clendenen
          United States Department of Justice
14        1100 L Street, NW
          Washington, DC 20530
15

16

17

18

19

20

21

22

23

24

25
```

1        (Proceedings held on March 26, 2024.)

2            THE COURT:  I seem to have some imbalance of counsel

3    here.  Do you guys want to spread out?

4        Well, good afternoon, everyone.  We're here on Oklahoma

5    vs. U.S. Department of Health and Human Services.

6        Let me have appearances by counsel, please.

7            MR. HILLIS:  Tom Hillis for the State of Oklahoma, and

8    with me is Barry Reynolds, my partner Miles McFadden, my

9    partner A.J. Ferate, and Audrey Weaver with the attorney

10   general's office.

11       I would also like to introduce Ellen Carr, intern with the

12   A.G.'s office, Your Honor.

13           THE COURT:  Let's have her just present this, why

14   don't we?

15           MR. HILLIS:  She would do better than me, Judge.

16           THE COURT:  All right.  Mr. Hillis, are you going to

17   be the lead counsel here on this?

18           MR. HILLIS:  Yes, Your Honor.

19           THE COURT:  All right.  And who's here on behalf of

20   the defendant?

21           MR. CLENDENEN:  Good afternoon, Your Honor.  Michael

22   Clendenen from the Department of Justice.

23           THE COURT:  It's Clendenen?

24           MR. CLENDENEN:  Yes.  Yes, Your Honor.

25           THE COURT:  All right.  This is in connection with the

1    State's request for preliminary injunction.  Let me ask just as

2    a threshold matter:  I think I had mentioned in the order

3    setting the hearing that I wanted everyone to let me know if

4    there was going to be evidence to be offered, and as I

5    understand it from I think the State's submission, the plan is

6    no testimonial evidence, but essentially the various exhibits

7    that have been presented are coming in by agreement; is that

8    essentially what the agreement is?

9            MR. HILLIS:  Yes, Your Honor.

10           MR. CLENDENEN:  Yes, Your Honor.

11           THE COURT:  All right.  Okay.  Then we'll proceed with

12   the case here just as — on the basis that it's essentially

13   oral argument.

14       I have spent a fair amount of time in the briefs in this

15   case.  It's got some thorny, many-facetted issues to it, but it

16   did seem to me that it was involved enough and involving enough

17   substantial theories that don't come before me in your average

18   employment discrimination case or felon in possession case that

19   it would be helpful to have some argument from counsel to

20   assist me in making a determination.

21       So Mr. Hillis, why don't you step to the podium and let's

22   hear from you first and we can start working through this.

23       I guess at the very outset, I just — to be very clear on

24   it, in terms of the specific injunction that the State's asking

25   for here, as I understand it, the circumstances are there was a

1    grant made, and then based on later developments, the grant was

2    terminated.

3        So is the State's request essentially a mandatory

4    injunction asking me to restore a funding flow or what?

5            MR. HILLIS:  It's not necessarily restore -- I'm

6    sorry, maybe a little loud.

7        But what we have, Your Honor, we have yearly grants that

8    are made under Title X.  And it's my understanding that those

9    grants are documented on April 1st of every year, with the

10    funds flowing in, I believe, July or August of each year.

11        So that's the need for the preliminary injunction, is to

12    prohibit the HHS from denying Oklahoma a grant solely on the

13    basis that Oklahoma will not require referrals for abortion

14    under Title X.

15            THE COURT:  Maybe I'm splitting hairs here, and it may

16    not make any difference, but I gather, though, that the --

17    based on the termination letter from the federal department,

18    that the grant has been terminated, so in effect, this would be

19    a declaration or something to reinstate the grant?

20            MR. HILLIS:  To reinstate the grant and to allow us to

21    apply this fiscal year without requiring us to have the program

22    require abortion referrals.

23            THE COURT:  Now, the -- some of the submissions here,

24    I don't recall whose they were, talked in terms of a five-year

25    funding cycle that happens on this Title X program.

1    I assume we're — based on what you're saying, that we're

2    now, what, one year into that five-year cycle, but it's just a

3    question of making the further request for the —

4        MR. HILLIS:  Yeah.  And it's a little odd.  I don't

5    know if it's for accounting reasons, but the grants are for a

6    five-year period, but then there are yearly renewals of that

7    grant.

8    And so they've taken away the four and a half million

9    already, but what we're here today is to say that the federal

10   government cannot deny us a future grant solely on the basis

11   that we will not refer for abortions.

12   So in this April — it's my understanding the grants are

13   announced on April 1.  And what we're saying is that the

14   federal government cannot deny Oklahoma a grant solely on the

15   basis that Oklahoma will not refer for abortions.

16       THE COURT:  But the urgency of the April 1 deadline is

17   the State's view that if you're not on the list that's

18   announced April 1, you can't ever get it back later?

19       MR. HILLIS:  That's my understanding, Your Honor.  I'm

20   not here as a government grants expert, but we have had

21   detailed communications with the Department of Justice, and

22   that's the understanding that I have, Your Honor.

23   So the critical deadline is April 1st to be awarded a

24   grant that will be funded in July or August of this year.

25       THE COURT:  Well, in that connection, let me ask, I

1  think there's — there was an indication in the — in your

2  papers that after the termination letter was received from the

3  feds — I frankly have debated about how to refer to the

4  parties here.  You know, we've got enough HHSs on both ends

5  that it gets — so I may refer to the State and the feds.  That

6  may seem less respectful than might be the case otherwise,

7  but —

8          MR. HILLIS:  And in my mind, I do State and then HHS,

9  I'm meaning —

10          THE COURT:  All right.  State and HHS is probably a

11  better way to do it.

12      But at any rate, the suggestion was that after HHS sent

13  the termination letter, there was an appeal —

14          MR. HILLIS:  Yes.

15          THE COURT:  — that was filed by the State that I

16  gather is still pending.

17          MR. HILLIS:  My understanding, Your Honor, yes.

18          THE COURT:  Does that preserve something in terms of

19  potential entitlement to being funded, if the decision here

20  should ultimately be in the State's favor?

21          MR. HILLIS:  I don't know that we can recoup the funds

22  that have been paid to the Missouri outfit, but that's not what

23  we're seeking now.

24      What we're seeking now is just a declaration to HHS that

25  says you cannot mandate that Oklahoma have an abortion referral

1   in its Title VII — or Title X, I'm sorry — Title X

2   application.  And that would put us in line to get another

3   grant on the next grant cycle.

4            THE COURT:  All right.  All right.  Go ahead.

5            MR. HILLIS:  Okay.

6       May it please the Court.  Appreciate the Court's attention

7   to this very serious matter for the people of the state of

8   Oklahoma.

9       I do want to commend the Department of Justice for their

10  collegiality in this case.  With the cooperation of the

11  Department of Justice, we have a very finite issue for Your

12  Honor.

13      And literally, that finite issue is:  Is it lawful for

14  health and human services to require Title X grantees to refer

15  patients who request to abortion providers.  That's the issue

16  in front of Your Honor.

17      And that's a crystallized issue that we think is very

18  clearly decided in Oklahoma's favor.

19      You'll see, just a brief history, Oklahoma has been a

20  Title X grantee for at least four decades.  With that, the

21  State of Oklahoma funds very vital family planning services

22  through a network established through the Oklahoma Department

23  of Health.

24      The State of Oklahoma funds 68 separate county health

25  departments to provide crucial and necessary funding for the

1    people of the state of Oklahoma.

2         THE COURT:  What are the ones that don't — that

3    aren't in the 68?  Is it like the city-county health

4    departments in the major metro areas that are not part of the

5    mix?

6         MR. HILLIS:  My guess is some of the health

7    departments cover multiple counties, because we've got 68 of

8    the 77 counties, so — but I can't say that I'm conversational

9    on that.  But there are 68 separate health departments that are

10   funded with Title X funds.

11        With that, Oklahoma is able to provide very valuable

12   family planning services to people largely who would not get

13   access to that.

14        Oklahoma is largely a rural state.  We have two major

15   metropolitan areas:  Tulsa and Oklahoma City, obviously.  But

16   then the rest of the state — and I'm from Lawton, so that's

17   not a major metropolitan area, but is a metropolitan area —

18   but you have large swaths of Oklahoma that are rural without

19   access to quality care.

20        While that — those gaps in those, particularly in the

21   rural counties are funded by the State of Oklahoma Department

22   of Health, and literally you have people with no access to

23   medical care, but their county health department.  So this

24   issue is critical for the state of Oklahoma.

25        Oklahoma has adopted this program.  It was last reviewed

1  in 2016.  We have that as -- I believe our review is attached.

2  Yeah, it's Exhibit 2 to our preliminary injunction.

3      You will see that Oklahoma was commended for its Title X

4  program in Exhibit 2.  Matter fact, it was so good, that

5  review, that the next review was not even granted or was not

6  even required until 2024.

7      So Oklahoma has a well-developed, long-standing Title X

8  program that was very, very effective for the people of the

9  state of Oklahoma.

10     Obviously, the tension in this case comes in 2022.  And

11 that's when the United States Supreme Court overruled decades

12 of precedent in the *Dobbs* decision.

13     All of a sudden, *Dobbs* returned legislation with respect

14 to abortion to the states, where for decades, it had been

15 purely a federal issue.  And so that triggered a whole series

16 of events that gets us here today.

17     And that requirement, it goes back to vacillating HHS

18 regulations on abortion referrals.

19     Title X is very clear in 1008 that Title X funds cannot be

20 used in a program where abortion is a method of family

21 planning.  Crystal clear, no one's arguing that.

22     HHS has taken, again, a vacillating position, and I think

23 both the U.S. Government and the state government agree on that

24 vacillation.

25     HHS went from requiring referrals to prohibiting referrals

1    to requiring referrals.  Again, solely on the backdrop of 1008,

2    which says that abortion can't -- funds can't be used in a

3    program where abortion is a method of family planning.

4        The issue in front of Your Honor was never ripe before

5    *Dobbs*.  Because prior to *Dobbs*, Oklahoma could not make illegal

6    referrals for abortion.  Again, that changed completely with

7    the *Dobbs* decision.

8        With the *Dobbs* decision, all of a sudden Oklahoma could,

9    in fact, regulate abortion.  Oklahoma's elected leaders have

10   elected -- made the policy decision that not only we're going

11   to outlaw abortion, we're going to outlaw counseling for

12   abortion.

13              THE COURT:  What are you basing that on?

14              MR. HILLIS:  The statute, 861 is the -- 21 O.S. 861,

15   Your Honor.

16              THE COURT:  Well, all right.  Go ahead.

17              MR. HILLIS:  Okay.  So that creates a tension that

18   didn't exist in this case.  So the State Department of Health

19   then looked at the regulations that now have ping-ponged back

20   to having abortion referrals being mandated.

21        And the State looked at the regulation, which is 42 CFR

22   59.5, and I'm in A, that requires a Title X program to refer

23   for abortion, if requested.

24        But what 59(b)(6) provides, contradictory to that mandate,

25   59(b)(6) provides that "Provide that family planning medical

1    services will be performed under the direction of a clinical

2    service provider, with services offered within their scope and

3    practice and allowable under state law."

4        So in Oklahoma's mind, those are contradictory.  That

5    there's a thou shalt require abortion referrals, but then

6    there's also a carve out that the services have to be allowable

7    under state law.

8        So Oklahoma, in their — they've already been approved for

9    the grant, but now they're doing their yearly approval, they

10   then modify that Oklahoma will comply with the abortion

11   referral, if it's allowable under state law.

12           THE COURT:  Let me ask just I guess partly as a matter

13   of being clear on the timeline, but I think it relates

14   potentially to maybe help focus on where the conflict

15   ultimately came from.

16       This version of the rule, this 42 CFR 59.5 was adopted in

17   October of 2021 —

18           MR. HILLIS:  Yes, sir.

19           THE COURT:  — right?  And then the grant from — or

20   the application from the State of Oklahoma under Title X got

21   approved in March of 2022?

22           MR. HILLIS:  Yes.

23           THE COURT:  And then I'm saying this based on what

24   was, I think, in some of the letters back and forth and that

25   were describing the history, but at least it said that in

1    August of 2022, this would be after the award had been

2    approved, that Oklahoma proposed changes in how the

3    nondirective options counseling was to be provided and wanted

4    to shift to just providing clients with a link to the HHS

5    website.

6        And, apparently, HHS rejected that, which triggered some

7    kind of an appeal, but at any rate, they rejected that and

8    asked for maybe an alternative proposal.

9        I mean, is all that accurate as you understand it up to

10   that point?

11       MR. HILLIS:  Well, I think Oklahoma vacillated a

12   little bit here because we initially thought we could lawfully

13   do the link —

14       THE COURT:  Well, that's what I'm getting to.

15       MR. HILLIS:  Yeah.

16       THE COURT:  The — they talk about wanting some

17   alternative proposals which, apparently, in February of 2023,

18   Oklahoma did make an alternative proposal that proposed that

19   counseling on all pregnancy options, which I assume would

20   include abortion, could come either through the department of

21   health staff or from this All Options Talk Line.  That was

22   Oklahoma's proposal.

23       MR. HILLIS:  Tertiary proposal, yes.

24       THE COURT:  I thought tertiary had to do with oil

25   wells.

1          MR. HILLIS:  Well, the first one.  I shouldn't use

2   75-cent words.  I'm sorry.

3          THE COURT:  Anyway, but apparently, then, as I

4   understand it, HHS concluded that that was okay, that that —

5          MR. HILLIS:  Initially.

6          THE COURT:  That that alternative proposal would meet

7   the requirements for the grant.

8       And then there's an indication that it's — that in May of

9   2023, Oklahoma advised that it had a change required in our

10  family planning program policy effective late afternoon of

11  4-27-23.

12         MR. HILLIS:  Yes, you have the chronology correct,

13  Your Honor.

14         THE COURT:  So I guess my question is what happened on

15  the afternoon of 4-27-23?

16         MR. HILLIS:  I'm reading tea leaves here, but what

17  happened, I think, is that *Dobbs* was a complete sea change for

18  the State of Oklahoma.  Well, all 50 states.  And so it just

19  took some time to work through that.

20      And so the 4-27 is the ultimate position of the State that

21  we believe it's unlawful to refer for abortion.  So I think

22  that was —

23         THE COURT:  I guess the thing that strikes me as odd

24  about that is, I'm quoting this directly when it says that this

25  thing happened late afternoon of 4-27-23.  I mean, maybe that's

1  when the lightbulb went off, I don't know.

2       But it would seem to me like there must have been

3  something more specific than that that was being alluded to

4  with that level of specificity.

5            MR. HILLIS:  I think that that is, you know, decisions

6  are events, but they're preceded by processes.  And I think the

7  4-27 was the culmination of a process that the State went

8  through in deciding the impact of the *Dobbs* decision, looking

9  at the extant state law and that that was the culmination, that

10 we don't think that referrals for abortions are lawful under

11 the State of Oklahoma law.

12           THE COURT:  And that's based on the 21 O.S. 861 you're

13 talking about?

14           MR. HILLIS:  Yes, Your Honor.

15           THE COURT:  Well, let me ask you about that.

16      That's what I was looking for previously when I was trying

17 to get it, but the language of that statute makes it criminal

18 to advise a woman to take medication or employ some other means

19 to terminate a pregnancy or to procure the abortion, obviously,

20 but I guess the thing that — or at least the question that

21 comes to my mind is when it says — or what is criminalized is

22 advising the woman to go do something.

23           MR. HILLIS:  Right.  Or counsel, I believe is in — I

24 don't have the statute.

25           THE COURT:  There isn't any reference to counseling,

1    but I guess that's my point.  It doesn't say you can't bring up

2    the subject.  It just says you can't advise them to take a

3    particular course of action.

4        So I guess my question would be, as I understand it in

5    terms of what this referral requirement is, it keeps talking in

6    terms of -- what is it -- a nondirective provision of basic

7    information, that if it's nondirective, why would you

8    interpret -- if the nondirective provision of information is

9    what they're talking about, that's what's a referral, then I'm

10   having trouble seeing how that violates the statute.

11       I mean, statute seems to contemplate somebody advising the

12   woman to do something.

13            MR. HILLIS:  Right.  And that's the position of the

14   attorney general of the State of Oklahoma, that the referral

15   would run afoul of 21 O.S., Section 861.

16            THE COURT:  Well, you mean -- is it the attorney

17   general's position that, let's just say you've got a pregnant

18   woman sitting in the -- you know, the local health department

19   office in Lawton and she says, "I'm pregnant, what are my

20   options?"  If the health department personnel -- if the health

21   department person sitting there says, "Well, abortion's not

22   legal in Oklahoma unless your life's in danger, but you can

23   call this number to get some other information."

24            MR. HILLIS:  I believe the attorney general takes the

25   position that that's unlawful.

1          THE COURT:  Seriously?

2          MR. HILLIS:  Yes, Your Honor.

3          THE COURT:  Really?

4          MR. HILLIS:  Yes.

5          THE COURT:  Well, okay.

6          MR. HILLIS:  So ...

7          THE COURT:  Does he think it's unlawful to mention the

8    word "abortion"?

9          MR. HILLIS:  I don't think mention, but I think that

10   goes into would that be considered advising or counseling an

11   abortion.

12         THE COURT:  You think -- would it be a crime for

13   someone to say abortion's legal in Colorado?  Is that a crime?

14         MR. HILLIS:  I'm not a criminal lawyer, but no, I

15   would not think that would be -- run afoul of 861, to make a

16   factual -- if that's a factual statement.

17         THE COURT:  So if that's not a crime, why would it be

18   a crime to refer somebody to a phone number that might tell

19   them that it was legal in Colorado?

20         MR. HILLIS:  Because that's the purpose, is to promote

21   abortions.  And that's what the State of Oklahoma, through its

22   elected legislatures, don't want to do.

23         THE COURT:  But it's Oklahoma's position that anything

24   that mentions the possibility of abortion is thereby promoting

25   it?

1          MR. HILLIS:  I don't think it goes that far, but to

2    give someone abortion providers would at least potentially run

3    afoul of advising someone to get an abortion.  And that's the

4    part that is problematic for the State of Oklahoma.

5          THE COURT:  But as I understand it, the referral

6    requirement only applies if the client or the patient, whatever

7    the right word would be, requests it.

8          MR. HILLIS:  That's the way the reg is written.

9    You're right.

10         THE COURT:  And that would suggest that the impetus

11   for the idea of thinking about it is not coming from HHS, it's

12   coming from the client.

13         MR. HILLIS:  The initial one, but then the genesis

14   could always be beyond the person advising it.

15         The genesis doesn't matter.  It's the fact of saying,

16   "Here are abortion providers that you can lawfully get an

17   abortion from."  That's the problem that potentially runs afoul

18   of 861.

19         THE COURT:  It would seem to me the question is

20   whether at what point you're advising somebody to do something.

21         MR. HILLIS:  Right.  If you're a state official or in

22   a state program and you're handing out something that says, you

23   know, Dr. Smith in Grand Island, Colorado, performs abortion,

24   to me, I can see why the State of Oklahoma, with its policy

25   against abortion, would not want people using state-directed

1    funds to do that.  I think that's a legitimate regulatory ask

2    post *Dobbs*.

3              THE COURT:  Well, may well be a legitimate regulatory

4    ask.  I'm not sure that's the same thing as saying it's

5    criminal.

6              MR. HILLIS:  But there's at least litigious

7    uncertainty over that.  And that's the part where, you know,

8    we're entitled to construe our state statutes and to direct our

9    county officials on what's lawful and what's not lawful.

10             And at least there's litigious uncertainty, and, you know,

11   I can't cite you, you know, State v. Smith, the Court of

12   Criminal Appeals said yea or nay, but there's at least

13   litigious uncertainty over there.  And discretion being the

14   better a part of valor, I can understand why the department of

15   health said, no, we can't comply with that.

16             Particularly, in light of — if you read the rest of the

17   regulation, Your Honor, I think it becomes clear, because as

18   the government noted in their brief, one part of the regulation

19   says — and this is on page 12 of their brief.  This is 59 —

20   42 CFR 59.5(a)(5), "Objecting providers or Title X grantees are

21   not required to counsel or refer for abortions."  That's their

22   own regulation.  That's their own quote right out of their

23   statute or right out of their brief.

24             THE COURT:  Is that the regulation they say's been

25   vacated?

1          MR. HILLIS:  I don't believe so.

2          THE COURT:  Somewhere in a brief there's a footnote --

3          MR. HILLIS:  There was one.  I don't believe it's

4  59.5(a), because that's the one they're trying to tie us up

5  with.

6          And so I'm fast forwarding.  My argument would have

7  proceeded differently, but here, their regulation first of all

8  says, thou shall refer for abortion referrals.  But then that

9  same regulation says, "Objecting providers or Title X grantees

10  are not required to counsel or refer for abortions."  And I'm

11  quoting right now out of their own brief.

12          And so those are conflicting right there.  And that

13  obviates one of their arguments about the necessary clarity

14  that is needed for a funding requirement.

15          So the real issue here is:  Is the requirement that Title

16  X grantees -- and Oklahoma is a Title X grantee.  The grant

17  that we submitted in our paper denominates the State of

18  Oklahoma as a grantee.

19          Can Title X grantees be denied funding based on a funding

20  condition that is not in the statute?  That's the issue in

21  front of Your Honor.

22          THE COURT:  Well, if that's the statute, that sounds

23  like a facial challenge to the regulation to me.

24          MR. HILLIS:  Well, right now what we have is not a

25  facial challenge to the regulation.  We've had $4.5 million

1    yanked away from us.

2            THE COURT:  I understand it has actual consequences,

3    but it does seem to me that if –– to the extent that you're

4    just saying, you know, they didn't have the authority to

5    promulgate the regulation they came up with, that's already

6    been resolved, hadn't it?

7            MR. HILLIS:  No.

8            THE COURT:  What significance ––

9            MR. HILLIS:  If you're referring to the *State of Ohio*.

10           THE COURT:  Yes, I am.

11           MR. HILLIS:  Okay.  And the *State of Ohio* case, Sixth

12   Circuit ––

13           THE COURT:  Right.

14           MR. HILLIS:  That was a facial challenge to the

15   regulation.  We're a vastly different area right now because we

16   are ––

17           THE COURT:  Well, I assume you would agree, though,

18   that to the extent anything you're doing now is a facial

19   challenge, it's barred by the *Ohio* decision.

20           MR. HILLIS:  It's contrary to the *Ohio* decision.  The

21   government has not taken the position that that's collateral

22   estoppel in this case.

23           THE COURT:  Why doesn't that obviously flow here?

24           MR. HILLIS:  Because it was an as-applied or it was a

25   facial challenge and this is an as-applied challenge.

1  Because --

2         THE COURT:  No, but my question is to the extent that

3  it is a facial challenge in substance, isn't it precluded by

4  the *Ohio* decision?

5         MR. HILLIS:  It's contrary to the *Ohio* decision.  I

6  have not been faced with the government arguing that the *Ohio*

7  court or the Sixth Circuit is binding on Your Honor or binding

8  on the State of Oklahoma.

9      But you are right, the State of Oklahoma was a party in

10  the Sixth Circuit litigation.

11         THE COURT:  Well, I mean, it does seem to me that, you

12  know, ordinarily if I was having to consider a Sixth Circuit

13  case, I would give it whatever weight I thought it deserved

14  based on how persuasive it was.  I mean, it doesn't bind me

15  like something out of the Tenth Circuit would.

16         MR. HILLIS:  Out of Denver, right.

17         THE COURT:  But it does seem to me that it's a

18  pertinent distinction here that Oklahoma was a party to that

19  case.

20         MR. HILLIS:  Yes.  I agree.  I have to distinguish

21  *Ohio*.  I will agree with that.

22      But we can readily distinguish *Ohio*, because *Ohio*, again,

23  as you noted, was a facial challenge.  There's a vast

24  difference between a facial challenge and an as-applied

25  challenge in this case.

1          Because the as-applied challenge, the government, the

2    federal government does not get the benefit of *Chevron*

3    deference.  That's crucial in this case.

4          Because if you read the *Ohio* opinion, its premise is

5    *Chevron* deference.  If you took away *Chevron* deference, I'll

6    submit the *Ohio* justices would have reached a different

7    decision, and they should have.

8          Because in this case, we've had four and a half million

9    dollars taken away from the State of Oklahoma.  So we have an

10   as-applied challenge.

11         As-applied challenges —

12             THE COURT:  Well, what is the difference in terms

13   of — well, go ahead and finish your sentence.

14             MR. HILLIS:  In a facial challenge, the skin — the

15   cat hadn't been skinned.  In applied challenges, the cat's been

16   skinned.  The money is gone from the State of Oklahoma.  So we

17   can challenge:  Is that funding condition, is it statutorily

18   based?

19         You have to apply the law without giving deference to the

20   government in this case.

21         That is absolutely crucial, because if you look at

22   *Pennhurst, Pennhurst* is a Judge — Justice Rehnquist opinion

23   that sets up what Your Honor should do when facing a funding

24   decision by the government.

25         And *Pennhurst* is absolutely clear that funding conditions

 1    must come from the text of the statute.

 2            THE COURT:  This is your Spending Clause argument?

 3            MR. HILLIS:  Spending Clause.  Article I, Section 8.

 4    *Pennhurst* is crystal clear that that clarity must come from the

 5    statute.  That differentiates the *Ohio* case entirely, because

 6    the *Ohio* case, if you'll read it, they spend a lot of pages, a

 7    lot of ink and paper on the *Chevron* deference.

 8            But here, the answer, I think, for Your Honor is decided

 9    in an as-applied challenge by the *Rust* decision.  Because *Rust*

10    clearly holds on all fours that Title X does not either

11    maintain or proscribe abortion referrals.  It's just completely

12    agnostic, so there's nothing in that regulation.

13            THE COURT:  Well, it says as a matter of *Chevron*

14    deference that you have to, at least as to that statute, accord

15    deference to the agency's interpretation, which can change over

16    the years.  And it has changed.

17            MR. HILLIS:  In an as-applied challenge under *Rust*.

18    But remember, the holding of *Rust* is impactful.

19            The holding of *Rust* is that the Secretary could, because

20    of the language of 1008, prohibit abortion referrals.  That is

21    very consistent with the language of 1008 that says that

22    projects cannot use abortion as a method of family planning.

23            And so that's just a logical outreach in a facial

24    challenge that the Secretary was okay to ban entirely abortion

25    referrals.  That's consistent with the text of 1008.

1    *Rust* did apply *Chevron* deference to get to that point, but

2    what *Rust* does not stand for is that if a statute is silent as

3    to a funding requirement, can the agency make it up.

4            THE COURT:  Well, but what do you do in a situation

5    like we've got here where the statutes that are part of Title X

6    explicitly says the Secretary can prescribe conditions.

7            MR. HILLIS:  Right.  And so you look at that and see,

8    does that give the Secretary carte blanche to come up with

9    whatever rules or regulations that they want.

10            And if you look at the case law, and this — we've got to

11   get down into the weeds here, and I apologize for that.  But if

12   you look at the case law, the case law is clear —

13            THE COURT:  Well, you don't have to look —

14            MR. HILLIS:  — that that general delegation does not

15   give the Secretary carte blanche to come up with funding

16   conditions that are not in the statute.

17            And very clearly, abortion referrals are not in the

18   statute.  That's crystal clear —

19            THE COURT:  So you're saying you think the law is that

20   we don't even have to get to the point of worrying about the

21   presence or absence of *Chevron* deference, because it doesn't

22   count anyway?

23            MR. HILLIS:  Yeah, you don't get there because the

24   Secretary was not empowered to exercise legislative function

25   when Congress chose not to do it.

1    Cases are clear, they can't fill in that legislative gap.

2  And I can walk you through the cases to get you there.

3         THE COURT:  Well, they've been filling in that gap for

4  30 years.

5         MR. HILLIS:  Well, but remember, for 30 years, there

6  was no tension.  The tension shows up in 2022 with the *Dobbs*

7  decision.

8         THE COURT:  The *Dobbs* decision didn't invent the

9  Spending Clause at that point.  The Spending Clause —

10        MR. HILLIS:  Right.  But there were no challenges to

11 it because it was lawful in every state.  Now we at least have

12 serious concern that abortion referrals are unlawful in the

13 State of Oklahoma.

14        THE COURT:  But if that was the case, wouldn't that

15 have come up in the *Ohio* decision?

16        MR. HILLIS:  Not in a facial challenge, because you

17 have *Chevron* deference.  The crucial part of — and I hope

18 you — I'm making myself clear.

19     The *Ohio* case was entirely dependent on *Chevron* deference.

20 We don't have *Chevron* deference in an as-applied challenge.

21        THE COURT:  My point is the *Ohio* case said, based on

22 what they viewed as having been determined in *Rust* and the

23 nature of — what is it — 1008, that *Chevron* deference did

24 apply and that that included not only the result in *Rust* where

25 they said it's within the permissible zone of regulatory

1    regulation-making to ban referrals, but it's also within the

2    permissible zone to require them.

3            MR. HILLIS:  Right.

4            THE COURT:  So if that's all the case, I mean —

5            MR. HILLIS:  But that's not all the case, because it

6    only gets to that point based on *Chevron* deference.

7            You take that *Chevron* deference away and apply the

8    as-applied Article I, Section 8 challenge cases, that's when

9    you see the Secretary does not have the authority to exercise

10   legislative functions.  That's crystal clear under every case,

11   and I'm going to unfortunately have to walk you through a

12   relatively tedious exposé, because it is necessary.

13           The cases that we rely on crystal clear, *Pennhurst* says

14   that the funding conditions must be unmistakably clear.  If you

15   look at the *Morrisey* case out of —

16           THE COURT:  Well, let me ask you about one that I was

17   looking at, because I think it's maybe cited in your brief or

18   somebody's brief, but it's the *Arlington Central School*

19   *District* case that was talking about an attorney's fee statute,

20   as I remember.

21           MR. HILLIS:  Yes.  That was in my hit list here.

22           THE COURT:  And the statute, whatever the federal

23   statute was, said you could recover attorney's fees.  And —

24           MR. HILLIS:  Expert fees weren't costs, yeah.

25           THE COURT:  And it wasn't a situation, though, of

1    where, you know, there were suddenly new regulations that came

2    out.  It didn't involve regulations.  So I guess I'm having

3    trouble seeing how this whole argument fits.

4         If there is statutory authority for the Secretary to do

5    something and they've done something, I mean, you know, these

6    cases that you've cited on the Spending Clause thing are,

7    basically, it seems to me, saying, you know, you can't enter

8    into what amounts to a contract with the State and then later

9    come in and superimpose requirements on them after the fact.

10   Isn't that the essence of it?

11         MR. HILLIS:  That's part of it.

12         But I don't know if you're referring to the *Bennett* case,

13   but if you look at each of these cases, and the government

14   cited four principal cases for what I call a general delegation

15   to the administrator.  Can — under a general delegation, can

16   the agency head exercise legislative functions.  And the cases

17   are all crystal clear:  You absolutely cannot.

18         The first case they cite is the *Bennett v. Kentucky*

19   *Department of Education* case, which is a Justice O'Connor

20   opinion under I believe it was Title I of the Elementary

21   Education Act.

22         And in that case, the federal government provided

23   educational funds to developmentally disabled individuals.

24         The agency head then came up with a regulation that

25   prohibited, it's called "supplanting," that the State couldn't

1    use the federal funds and then just yank away the extant State

2    funds that were spent for developmentally disabled, so they had

3    to spend their money and then the federal money was an add-on.

4        But in *Bennett*, what happened, Congress amended Title I to

5    adopt the supplanting language.

6        And Justice O'Connor said, "In order to assure that

7    federal funds would be used to support additional services that

8    would not otherwise be available, the Title I program from the

9    outset prohibited the use of federal grants to replace state

10   funds.  This prohibition initially was contained in regulations

11   and explained in the program.  Congress responded by amending

12   Title I in 1970 to add a provision that specifically prohibited

13   supplanting."

14       So Congress came in and adopted that as the law of the

15   land.  That's what made that appropriate.

16       And if you look at the text of Justice O'Connor's opinion,

17   she says at page — I believe it's 47 U.S. 666, "The requisite

18   clarity in this case is provided by Title I."  Not the

19   regulation.  Title I.

20       So in that case, Justice O'Connor did not look at the

21   general delegation, she looked at the text of the statute.

22       If you look at the federal government cites *Biden v.*

23   *Missouri*, a case wholly not on point.  It was a delegation

24   doctrine case using COVID funds.

25       The final two cases they rely on are *Gruver* and

1    *Mississippi Commission.*  Those two cases are coercion cases.

2    They're not requirements cases.  So they're not on point.

3        So none of the cases stand for the proposition the

4    government cites them for you, that a general delegation to the

5    agency allows it to exercise funds.

6        The fallacy of their argument should be readily apparent

7    because the only case law that's out there that a general

8    delegation is sufficient to allow the agency to exercise

9    legislative functions is the Tennessee case, Justice McDonough,

10   about ten days ago.

11       But the important thing — so you have to look at the —

12   what undergirds Justice — Judge McDonough's opinion to see if

13   it's worth following or not.

14       He cites three primary cases; none of the cases that the

15   government cited here.  So Judge McDonough didn't even think

16   they were authoritative.  He first of all cites to *Jackson v.*

17   *Board of Education.*  Again, a Justice O'Connor opinion.

18       In that case, we were dealing with Title IX of funding and

19   whether you could imply a cause of action based on the

20   statute's language.

21       The language Justice O'Connor uses is — and this is, I

22   believe, at page 179 or 178.  "We reach this result based on

23   the statute's text.  In step with Sandoval, we hold that

24   Title IX's private right of action encompasses suits for

25   retaliation because retaliation falls within the statutes

prohibited prohibition of intentional discrimination on the basis of sex."

So Justice O'Connor is saying the authority does not come from the regulator, it comes directly from the statute.

And what the ultimate opinion was, that Congress prohibited discrimination. The Court's construed discrimination to include unlawful retaliation. So that's just putting meaning to the words that Congress used.

THE COURT: But when we're dealing with a situation like what we have here, where Congress has essentially enacted a grant program --

MR. HILLIS: Yes.

THE COURT: -- and it's for the purpose of promoting family planning projects or whatever, is it your position that any requirement that might relate to that simply is unenforceable, unless it's in the statute?

MR. HILLIS: There has to be a statutory -- a nongeneral delegation to the regulator. And that's what the cases say.

THE COURT: Well, I assume you've looked at 59.5 that has a whole bunch of requirements that these plans or projects have to have. You're saying they're all invalid?

MR. HILLIS: The only one we're here on is the abortion referral. I've not studied the other ones, Judge.

THE COURT: But isn't that the logical consequence of

1    what you're saying, since none of them are in the statute?

2         MR. HILLIS:  No, the one that's crystal clear is that

3    *Rust* tells us abortion referrals are not in Title X.  That's

4    binding on every court.  And *Rust* says it's not in Title X, and

5    so that's what's binding.  And if it's not in Title X, HHS

6    cannot maintain it.  And if you look at the cases, that's what

7    it says.

8         The other case that they rely on is *Davis v. Monroe*.

9    Again, a Justice O'Connor opinion.

10        She says, "The language of Title IX itself, particularly

11   when viewed in conjunction with the requirement –– prohibition

12   of Title IX's prohibition to be liable in damages, also cabins

13   the range of misconduct."

14        So throughout *Jackson* and *Monroe*, Justice O'Connor is

15   citing not to regulations, she's citing to the text of

16   Title IX.

17        They also cite to, curiously –– or Justice McDonough

18   curiously cites the case of –– it was a Judge Alito case, I'm

19   sorry.  I've lost it here in my book.  *Arlington Central v.*

20   *Murphy*, where Justice Alito doesn't discuss regulations at all

21   in the majority opinion.

22        But what's telling is the dissent, Justice Breyer's

23   dissent.  And he tells us why, when you're looking at

24   implication of private rights of action, that that does not

25   have the same scrutiny as funding conditions under *Pennhurst*.

1    Justice Breyer says, "To the contrary, we have held that

2    *Pennhurst* requirement that Congress unambiguously set out a

3    condition on the grant of federal money does not necessarily

4    apply to legislating setting forth the remedies available

5    against a noncomplying state."

6        So that makes sense when you look at the difference

7    between Article I, Section 1 and Article I, Section 8.

8        Article I, Section 1 is the delegation doctrine.  And you

9    can have under an Article I, Section 1 delegation, you can have

10   a general delegation of authority to the executive branch.

11   That makes sense because the executive branch enforces the

12   laws.

13       The analogy the Courts use is Article I, Section 1 is

14   basically the sword.  And the sword is utilized by the

15   executive branch.  Article I, Section 8 challenges, however,

16   are the purse.  And the purse is quintessentially exercised by

17   the legislature.  That's the problem that we have here.

18       And if you look at the cases that are on point, that being

19   *Pennhurst*, *Morrisey* and the District Court of Colorado case

20   that is slipping my mind right now, and you've got *Yellen*.

21       If you look at — particularly instructive is the *Morrisey*

22   case.  Because *Morrisey* dealt with specifically an as-applied

23   funding condition challenge.

24       It says, "The Supreme Court's leading authority on the

25   limits of Spending Clause is *Pennhurst*," obviously.  And it

 1  says, "And Congress must speak unambiguously and with a clear

 2  voice when it imposes conditions on federal funds.  We explain

 3  that Congress must spell out a condition clearly enough for the

 4  states to make an informed choice."

 5          And here is the part that I think is instructive, and why

 6  a general delegation of authority -- and that's all we have

 7  here, we have a general delegation.  That general delegation

 8  cannot include legislative functions.  And this is right out of

 9  the *Morrisey* case, second -- "An agency cannot exercise

10  legislative power or otherwise operate independently of the

11  statute that authorized it."

12          I'm going to skip a cite.  "The Constitution gives

13  Congress, not the executive branch, the power to tax and spend

14  through the exercise of its legislative powers.  It follows,

15  therefore, that Congress, not an executive agency, must

16  exercise that power constitutionally."

17          Congress cannot delegate under Article I, Section 8 its

18  legislative powers to tax and spend.  That's a killer for the

19  government's argument in this case because it's clearly a

20  funding condition that is sans the statute.  Under *Rust*, that's

21  crystal clear.

22          *Morrisey* goes on to state, "Allowing an executive agency

23  to impose a condition that is not otherwise ascertainable in

24  the law Congress enacted would be inconsistent with the

25  Constitution's meticulous separation of powers, therefore, the

1    needed clarity under the Spending Clause must come directly

2    from the statute."

3        You don't get there with a general delegation of

4    authority.  The Colorado case, it's *Colorado v. Department of*

5    *Justice*, exact same thing.  And that's a District Court of

6    Colorado case from 2020.

7        It says, "However, agency-imposed grant conditions, even

8    if they, themselves, are unambiguous, cannot be constitutional

9    under the Spending Clause unless the statute from which they

10   originate is also unambiguous," citing *City of Philadelphia*

11   case.

12       "Spending Clause ambiguity cases generally involve

13   statutory construction, not interpretations of conditions

14   imposed by the agency."

15       So the binding authority here, they have zero authority in

16   this case, Your Honor, for the proposition that a general grant

17   of regulatory functions can serve to allow them to exercise

18   legislative functions.  That's a violation of the separation of

19   powers.

20       And here what you've got to look at, the government made

21   it easy on you and on page 21 of their brief, they cite to a

22   regulation, a delegation of authority, one which did not grant

23   legislative authority and one that they claim does grant

24   legislative authority.  I'll read those to you because, there's

25   no meaningful difference.

1    THE COURT:  Well, we've been going for a little better

2  than an hour here.  Why don't you kind of wrap up your end of

3  this in the next few minutes and I would like to hear from the

4  government.

5    MR. HILLIS:  Yeah, let me then transition.

6    The other thing that's impactful under why *Ohio* does not

7  apply is *Ohio* expressly did not consider the Weldon Amendment.

8    THE COURT:  They say your complaint doesn't, either.

9  What's the consequence of that?

10    MR. HILLIS:  It's none.  We don't have to specifically

11  mention the Weldon Amendment.  The Weldon Amendment is law.

12    We said their actions are unlawful, but if the only thing

13  we're doing is forcing me to amend my petition and coming right

14  back here, when they've been on notice the whole time, because

15  it was in our appeal as well.  So I didn't catch the government

16  flatfooted.  And so but I think that's —

17    THE COURT:  I suspect you're right about that.  Get to

18  the merits.

19    MR. HILLIS:  The Weldon Amendment, every dollar that

20  has been spent, including the dollars that were taken away from

21  us, pass through the Weldon Amendment.

22    And the Weldon Amendment is clear that you can't

23  discriminate against grantees who refuse to refer for abortion.

24  That's the congressional intent that you can look at under

25  *Pennhurst* to see does that comply or does it not comply.

1        And I think the Weldon Amendment is specifically pertinent

2   here in the application of the *Ohio* case, because *Ohio*

3   specifically — the *Ohio* case, the Sixth Circuit said, We

4   wonder why the Weldon Amendment wasn't raised?  I do too.

5        But here, we have raised it.  It's impactful.  It tells

6   you what the legislative intent was and it is very contrary to

7   the abortion mandate.

8        And I do appreciate you letting me go long, Your Honor.  I

9   do have some arbitrary and capricious argument that I want to

10  add, but I'm mindful of the Court's schedule.

11          THE COURT:  Take a couple minutes and tell me.  I've

12  read the briefs.

13          MR. HILLIS:  You have read the briefs.  But here, what

14  you have is the application — here is what we consider the

15  government is doing, it is looking at one regulation and

16  ignoring two others.  It is ignoring the regulation in the same

17  regulation that says that Title X grantees don't have to refer

18  for abortion.

19       How do you square that with they yanked our funding, so

20  for the singular reason that we will not refer for abortion.

21       So that's arbitrary and capricious, because they're

22  applying one regulation and they're ignoring another one.

23       It's also arbitrary and capricious because that same

24  regulation likewise says that the services have to be allowable

25  under state law.

1    The agency told you they did not consider the impact of

2    *Dobbs* in the '21 rule or when they redid it.

3    We think there's litigious uncertainty, at a minimum, on

4    if abortion referrals are lawful under state law.  And if we're

5    right, then they've run afoul of that regulation as well.

6    So we think the application is unlawful because they're

7    applying one regulation that overrides all the other

8    regulations, and they're ignoring -- and they also ignored the

9    Weldon Amendment.

10    So the Weldon Amendment is crucial, both for is *Ohio*

11    impactful to Your Honor, and the Weldon Amendment's crucial in

12    light of the as-applied to Oklahoma.

13    THE COURT:  Insofar as you're saying essentially that

14    their regulations are internally inconsistent, I recall the

15    briefs talking about some other kind of deference that,

16    frankly, I hadn't heard referred to before.  But as I

17    understand it, it's essentially saying, look, if the question

18    is how they're interpreting their own regulations, then there's

19    deference entitled -- that they're entitled to deference on

20    that.  I mean, after all, it's their regulations.

21    MR. HILLIS:  But they can't just ignore one and

22    they're ignoring one.  Because we are a Title X grantee and we

23    are being required to refer for abortion.  That's contrary to

24    their regulation.

25    And it's also contrary to services allowable under state

1    law.  You've got — you can't just ignore that.  You can't put

2    blinders on and say, We're going to do the bidding of the

3    executive here, and the bidding of the executive wants to

4    expand abortion.  That's not an appropriate exercise of agency

5    discretion, particularly in light of 1008, which at best, is

6    hostile to abortion.

7            THE COURT:  Well, doesn't it make some difference

8    here, though, that we're dealing with a grant program?  I mean,

9    you know, it would seem to me that if the federal government

10   came in and tried to, I don't know, impose some rule that said

11   we're going to just flat require you, whether you like it or

12   not, to go do an abortion referral.  It seems to me that's

13   different than saying if you don't want to do it, that's up to

14   you, but if you want this grant, you have to do it.

15           MR. HILLIS:  It may seem contradictory, but the most

16   exacting review is when an agency spends money.  That's the

17   Article I, Section 8 review that the requirements have to be

18   unmistakably clear.  That's the standard.

19        And if they're trying to say that the regulations can make

20   that be unmistakably clear, well, they're not, because you've

21   got two diametrically opposed regulations.  They're not

22   unmistakably clear.

23        Even if they could get across that huge gulf of them

24   exercising legislative functions, which is just prohibited

25   under *Morrisey*, *Kentucky v. Yellen*, every Supreme Court case

1    that's out there, so ...

2        I know I've been long-winded.  I appreciate Your Honor's

3    attention.  This is a very crucial matter for the people of the

4    state of Oklahoma.  We desperately need these funds and it's

5    just categorically unfair to withhold funds —

6            THE COURT:  Let me ask you about that, just to be

7    certain that I understand the circumstances.

8        I recall at some point in the briefs there were, you know,

9    some kind of suggestion that if this grant doesn't come

10   through, that all these 68 counties are going to be deprived of

11   services and people are going to, you know, not get what they

12   need.

13       I mean, as I understand it from the affidavit from your

14   deputy director, the legislature has appropriated supplemental

15   money to backstop this if you don't get the grant, right?

16           MR. HILLIS:  They have, but, Your Honor, that goes

17   right into — and I should have addressed this.

18       That goes right into irreparable harm.  Because Oklahoma

19   has a constitutional balance budget requirement.

20       So necessarily implicit or empirically, if we're spending

21   four and a half million dollars that should come from the

22   federal government, we're not spending that four and a half

23   million dollars somewhere else.  We're robbing Peter to pay

24   Paul.  That's irreparable harm.

25       The other thing is, you know, you need —

1          THE COURT:  I don't understand what you just said

2     about the balanced budget.  I don't understand how that —

3          MR. HILLIS:  Oklahoma can only spend as much money —

4     Oklahoma has to balance its budget, unlike the federal

5     government.  We can't borrow money to fund obligations.

6          So if we're going to spend four and a half million

7     dollars, we've got to take it from somewhere.  So it may come

8     from the highway fund that we can't — program that we can't

9     fund —

10          THE COURT:  Well, my point is the family planning

11     services that are being delivered through the local departments

12     of health are going to continue to be delivered, correct?

13          MR. HILLIS:  For at least this year, but whether

14     Oklahoma can afford to fund that going forward, we don't know.

15          THE COURT:  And so the question, when we're — I mean,

16     to the extent we're trying to balance harms here or whatever,

17     the harm is not that there are going to be services not

18     provided, it's just a matter of the State not being able to be

19     reimbursed for up to the extent of the grant.

20          MR. HILLIS:  Right.  But read all of *Ohio*.  There's

21     part of *Ohio* that you may not have read.  *Ohio* was a facial

22     challenge to the funding requirement.  That's what we've talked

23     about here.

24          It was also a challenge to — you've got to separate

25     abortion clinics from Title X clinics.

1          THE COURT:  The integrity part.

2          MR. HILLIS:  Yeah.

3          THE COURT:  I read that.

4          MR. HILLIS:  Okay.  And so they granted the injunction

5   on that, but they granted the injunction because the State of

6   Ohio lost $1.7 million.  State of Ohio is much bigger than the

7   state of Oklahoma.

8          But more importantly -- and I don't mean to point at you.

9   But more importantly, they still had 80 percent of their

10  funding.  And that was irreparable harm, according to the Sixth

11  Circuit.

12         Well, if 10 percent or 20 percent, I'm sorry, of a state's

13  funding that amounts to $1.7 million is irreparable harm,

14  taking away all of Oklahoma's funding necessarily has to be

15  irreparable harm.  But I don't think that's --

16         THE COURT:  And we're talking here about -- what is

17  it -- four and a half million?  Is that --

18         MR. HILLIS:  Yeah, we lost four and a half million,

19  Ohio lost 1.7 million.  But Ohio still got -- I can't do math

20  in my head like that, but Ohio still got eight million or so,

21  maybe seven.

22         But what the Sixth Circuit said is that that deprivation

23  of 20 percent of your Title X funds is irreparable harm.

24         THE COURT:  But I assume what makes it irreparable is

25  that there isn't a mechanism as against sovereign immunity to

1    recover it from the feds?

2            MR. HILLIS:  Yes.

3            THE COURT:  Is that it?  All right.

4            MR. HILLIS:  I do appreciate Your Honor.  Thank you

5    for your time.

6            THE COURT:  All right.  Mr. Clendenen.

7            MR. CLENDENEN:  Good afternoon.  May it please the

8    Court.  Michael Clendenen for the defendants.

9        For years, Oklahoma has accepted millions of dollars in

10   federal grant funding to support its family planning project.

11   These funds were expressly conditioned on the project's

12   provision of abortion counseling and referrals upon a patient's

13   request.  And for years, Oklahoma willingly accepted and

14   complied with this condition.

15       But starting in 2023, Oklahoma refused to satisfy the same

16   condition.  Oklahoma still wants the federal funds, it wants

17   them free of the condition and wants this Court to order the

18   federal agency to provide that funding, all despite the State's

19   disavowal of its prior agreement with the agency.

20       This Court should deny that request, just as the Tennessee

21   court denied a motion for preliminary injunction on similar

22   claims earlier this month.

23       I would start with some of the threshold questions that

24   Your Honor asked of the plaintiffs about what sort of relief

25   they're seeking, the State is seeking.

1      First, I would just note that I didn't see any proposed

2  order anywhere.  The plaintiffs haven't, you know, submitted —

3  they basically haven't shown what they're asking for, just they

4  say they want a preliminary injunction.

5      And it is their burden to, you know, submit a proposed

6  injunction that makes sense for the Court to order, if it finds

7  that they have met the requirements for a preliminary

8  injunction.

9      But as far as what an order could look like, if the

10 plaintiffs were successful, in the defendants' view, the only

11 thing that would really make sense is an order that says the

12 agency has to set aside funds for Oklahoma if they are — if

13 they prevail on a final judgment.

14     This is just a preliminary injunction motion that we're

15 dealing with, so it doesn't make sense to have a declaration

16 that says the federal agency has to provide the funds now to

17 Oklahoma.

18     I would also just clear up a couple things.  There was

19 questions about a five-year funding cycle.  I think that's

20 referring to the continuation grants.

21     So all of the Title X are for one year at a time.  Funding

22 is always given to all grantees one year at a time, but some

23 grantees are given a continuation grant, which means basically

24 that their application is approved for up to five years,

25 assuming they — you know, they still meet the requirements of

1    the program, they don't have to reapply each year for those

2    five years.  And that's what Oklahoma had here, except for the

3    termination.

4           THE COURT:  So the five-year cycle means every five

5    years, somebody comes in and does a big analysis of the details

6    of everything and if that's okay, then each of the succeeding

7    years is a more truncated procedure, I guess?

8           MR. CLENDENEN:  No, Your Honor, I don't think that's

9    quite correct.  It's really a matter of when the grantee has to

10   apply.

11          So in this case, Oklahoma applied I think in 2022, and

12   HHS, the federal agency, approved their grant application for a

13   continuation grant for five years, meaning that unless they did

14   something that made them not in compliance, they would continue

15   to get that grant funding for each of the next five years.

16          The funding still only goes out one year at a time, but

17   they would not have to reapply until five years down the road.

18          Also, I do want to address the April 1st deadline.

19          I think plaintiffs are correct when they say just as a

20   general matter that HHS usually obligates these funds on

21   April 1st and that they go out generally in July or August, but

22   by statute, the agency does have until the end of the fiscal

23   year to provide the funding.

24          So the only statutory requirement is that the funding go

25   out by September 30th.  The April 1st deadline and the

1    July—August time frame is not set in stone.  It can be

2    adjusted.

3            THE COURT:  Well, does the pendency of the appeal have

4    any impact on this?  I mean, have they somehow preserved their

5    rights to do something later?

6            MR. CLENDENEN:  Your Honor, I'm not 100 percent sure,

7    but I don't think that the agency interprets the pendency of an

8    appeal to preserve funding, necessarily.  The funding could

9    still go out, notwithstanding the fact that there's an

10   administrative appeal.

11           THE COURT:  As I understand Mr. Hillis' argument, he

12   says part of the urgency or the magic on April 1 is that it's

13   not a matter of HHS potentially holding it, but it potentially

14   turning around and giving the money out to other grantees.

15           MR. CLENDENEN:  Yes, Your Honor.  And as a general

16   matter, that is usually the time frame that HHS would do that,

17   but it's not required by statute.  It's not required by any

18   regulation either.

19           THE COURT:  Are you telling me that HHS is committed

20   not to do it here?

21           MR. CLENDENEN:  Your Honor, no, HHS isn't committed to

22   not — not doing anything on April 1st.  But —

23           THE COURT:  Well, you're not doing much to allay their

24   panic, if you're not in a position to do that.

25           MR. CLENDENEN:  Understood, Your Honor.  I just wanted

1    to make the point that it's not necessarily going to happen.

2              THE COURT:  All right.

3              MR. CLENDENEN:  So first I'll address their statutory

4    claims.

5         The Court correctly adduced that — that their arguments,

6    at least with respect to Section 1008, are just a rehash of

7    their arguments from the *Ohio* case, to which Oklahoma was a

8    plaintiff.

9         That was a facial challenge, but they haven't raised any

10   sort of factual distinction that would take this case out of

11   the ordinary case that *Ohio* dealt with.

12        So as a matter of legal analysis, there's nothing in their

13   statutory arguments that wasn't addressed in *Ohio* or at least

14   that they couldn't have raised in the *Ohio* case.

15        The only sort of twist that they had is the Weldon

16   Amendment, which wasn't specifically raised in the *Ohio* case,

17   but they could have raised it.

18        Weldon has been around since I believe 2004.  It hasn't

19   been changed, so there's no reason why Oklahoma couldn't have

20   raised it in that case.  It's just another facial challenge

21   based on the statute.  There's nothing about the as-applied

22   facts here that make it particular to the Weldon Amendment

23   arguments.

24        As the Court noted, they didn't raise it in their

25   complaint.  They raised it only in their preliminary injunction

1    motion, which was filed after the *Ohio* decision came out.  The

2    complaint was filed before the *Ohio* decision.

3         One note on the Weldon Amendment:  Oklahoma and the

4    plaintiffs in the *Ohio* case did at one point in their briefing

5    say that they didn't think that states were covered by these

6    conscientious statutes and that states couldn't be healthcare

7    providers.

8         So the docket for the *Ohio* Sixth Circuit appeal is Case

9    Number 21-4235.  And on Document Number 47, which I believe is

10   the brief of the appellants, they said that, "The district

11   court in that case doubted this constituted any irreparable

12   injury, noting that federal statutes protecting conscientious

13   and/or civil rights may exempt some, quote/unquote, providers,

14   from complying with the referral requirements," and they quote

15   the order.  And then they say, "But the states are not

16   protected under any of those statutes.  While individual

17   doctors working for the states might be, no statute would free

18   a government grantee from complying with the federal

19   requirement."  So that -- they've already --

20        THE COURT:  What about this regulation that Mr. Hillis

21   has referred to that I gather does refer to grantees?

22        MR. CLENDENEN:  So, Your Honor, that's a different

23   regulation.  That's part of the 2021 Rule.  It's not part of

24   the Weldon Amendment, if I'm understanding what you're

25   referring to.

1    They talk about --

2         THE COURT:  Well, I think he's talking about the part

3    he says is inconsistent with the other provisions of the rule,

4    but it's the --

5         MR. CLENDENEN:  Yeah, where they say, "Objecting

6    providers or Title X grantees are not required to counsel or

7    refer for abortions," is that the part that?

8         So that comes from the 2021 Rule, 86 Fed. Reg. at 56,153.

9         So that sentence is a reference to objecting providers and

10   grantees, but as we just -- I just said, states can't be

11   objecting providers or grantees.  They are not healthcare

12   entities that are protected by the Weldon Amendment.

13        The healthcare M.D.s are basically, you know, institutions

14   or individual providers.  They can't be a government agency.

15        THE COURT:  Let me ask:  I was talking to -- at the

16   beginning of Mr. Hillis' presentation, I was walking him

17   through a timeline to try to get a sense of exactly when the --

18   you know, when the decision was made and what the decision was

19   to -- that became the basis for the termination.

20        And I guess it has to do with this -- the hotline or

21   whatever that was called, that at one point Oklahoma had said

22   we'll do the hotline, and then changed its mind and wouldn't.

23        Is the -- in terms of complying with the rule's

24   requirement that there be a referral on request, does HHS view

25   providing that link to the hotline as complying with that?

1          MR. CLENDENEN:  Yes, Your Honor.

2          THE COURT:  In other words, if you've done that,

3    you've done the referral?

4          MR. CLENDENEN:  Yes, Your Honor.

5       And I would just add that it's at least unclear that doing

6    so, just providing the phone number, is a violation of Oklahoma

7    law.  So it's, at the very least, not clear that providers in

8    the state couldn't comply with the requirements of the

9    regulation and with Oklahoma state law.

10         THE COURT:  All right.

11         MR. CLENDENEN:  I do also want to address the argument

12   about the regulation that the services be allowable under state

13   law.  We addressed this on Page 13 of our brief.  It's also

14   thoroughly discussed in the Tennessee opinion.

15      But the language of the part they're quoting under 42 CFR

16   Section 59.5(b)(6) says that each Title X project must affirm

17   that, "family planning medical services will be performed under

18   the direction of a clinical services provider, comma, with

19   services offered within their scope of practice and allowable

20   under state law, comma, and with special training or experience

21   in family planning."

22      So this is a change of language that also took place in

23   the 2021 rule, the same rule that's being challenged here.

24      Where it says "clinical services provider," that had

25   previously said "physician."  And the change to add — to

1  change it to "clinical services provider" and then add the

2  phrase "allowable under state law" was meant to be an expansion

3  to allow for providers to be a physician —— sorry —— a

4  physician's assistant or a nurse practitioner or anyone along

5  those lines, if they're allowed to practice medicine under

6  state law.

7      It's not meant to be an expansion of the program that

8  services always has to be allowed under state law.  It just

9  refers to whether or not the provider is, you know, basically

10  medically certified to provide these services under state law.

11      And the Tennessee court addressed this and it found that

12  the regulation unambiguously means what HHS is saying it means,

13  but even if the Court thought it was ambiguous, it would be

14  subject to a *Kisor* deference, which also referred to as *Auer*

15  deference.

16      THE COURT:  That's the deference —— *Auer* deference,

17  that's the one I had not at least seen it described that way

18  before.

19      MR. CLENDENEN:  Yes, Your Honor.  *Auer* deference has

20  been around for a few decades, I'm not sure exactly what year

21  it was, and then in 2019, the Supreme Court reaffirmed it in

22  *Kisor v. Wilkie*, which we cite in our brief.

23      Also for the Spending Clause analysis, I'm happy to answer

24  any questions the Court has about that.  But I do think the

25  Tennessee court got it 100 percent correct in that case and it

1    would be the exact same analysis here.

2         Again, it's just a facial challenge.  Oklahoma could have

3    raised it in the Sixth Circuit case in — or sorry, in *Ohio*.

4    They didn't do so.  It's a facial challenge.  There's no

5    difference between this argument and what Tennessee addressed.

6         But if there's any questions on that, I'm happy to.

7         And then just a couple of other points on that.

8         At one point the plaintiffs, I think they said there's no

9    *Chevron* deference in an as-applied challenge.  I didn't see

10   that raised anywhere in a brief and I don't believe there's any

11   citation to that argument.  I don't believe that's correct.

12   *Chevron* deference is the framework, whether it's an as-applied

13   challenge or a facial challenge.

14        The *Ohio* decision already applies *Rust*, which is a *Chevron*

15   case, and it would be the same here as it is in *Ohio*.

16        Also, it seemed as though the plaintiffs were trying to

17   raise a nondelegation challenge, basically saying that a

18   statute is unconstitutional if it delegates legislative power

19   from Congress to an agency.  That's not raised in the complaint

20   or any of their briefing.

21        So if that's — the Court shouldn't entertain the claim,

22   since it wasn't raised, but to the extent that the Court is

23   interested in the merits, the Tennessee opinion does address

24   this in a footnote also.

25        I'm happy to address any other points the Court has, but

1    otherwise, I would rest my time.

2            THE COURT:  Well, I do have, I guess, one further

3    question, and that has to do with the hotline thing.

4        If somebody calls the hotline —

5            MR. CLENDENEN:  Yes, Your Honor.

6            THE COURT:  — who is on the other end of it and what

7    do they learn?

8            MR. CLENDENEN:  Your Honor, I'm not entirely sure who

9    is answering the phone.  I do know it's out of state.  It's not

10   located in Oklahoma.

11       They are given nondirective counseling on all options,

12   which is exactly what the HHS regulation says.

13       So if a patient calls and says, I'm pregnant, what are my

14   options?  They will give nondirective counseling about prenatal

15   care, adoption, foster care, that sort of option, and also

16   pregnancy termination.

17       It's nondirective, meaning they're not pushing one option

18   or another.  They're just giving neutral, factual information.

19       If the patient is interested in, you know, abortion, any

20   questions, the person on the phone would very likely say, Well,

21   there's no providers in the state of Oklahoma because it's not

22   legal there, but Kansas and Colorado have providers.

23       And then if the patient requests for a referral, then the

24   person on the hotline would give a referral.  Again, it's not

25   directive.  They're just basically providing address and phone

1    number.  They're not setting up transportation or anything like
2    that.  They're just giving the address and phone number for a
3    provider that would give those services.
4            THE COURT:  This is your chance.
5            MR. CLENDENEN:  Your Honor, I think I covered
6    everything.
7        Again, the Tennessee opinion goes through basically all
8    the same arguments and there's no reason why the Court should
9    reach a different result.
10            THE COURT:  All right.
11        Anything else you want to add, Mr. Hillis?
12            MR. HILLIS:  I do.  That may not surprise you.
13            THE COURT:  I'll give you 45 seconds to wrap it up.
14            MR. HILLIS:  I'll confine myself to two points.  I
15    won't get it done in 45 seconds, though.
16        The issue in front of Your Honor is weighty and unique,
17    because what you're being asked to do is to do something that
18    only one court to date that we've been able to determine has
19    done.  And that is to hold that a general delegation to an
20    agency includes legislative powers.
21        Approximately nine days ago, there were zero authority for
22    that, and I'm guessing when Judge McDonough issued his opinion.
23        But before his, the government couldn't cite you a case
24    that says that a general delegation suffices under the law to
25    allow them to attach funding conditions that are clearly sans

1    the statute.

2        So that's the issue that they're asking you is to follow

3    Judge McDonough.

4            THE COURT:  But how do you say here that it's clearly

5    sans the statute, when the —

6            MR. HILLIS:  *Rust*.

7            THE COURT:  —— when the statute that applies to Title

8    X says we're going to do a grant program designed to enhance

9    family planning services, and you're saying unless every single

10   element of what constitutes a family planning service is not

11   spelled out in the statute, it's not valid?

12           MR. HILLIS:  No.  What I'm saying is when the Supreme

13   Court has said explicitly that 1008 Title X does not have a

14   referral mandate, that that is insufficient to allow an

15   as-applied challenge under Article I, Section 8 of the United

16   States Constitution.

17       And just so you'll know, on page 25 is the —— one of these

18   delegations was found by Morrisey to be not sufficient and then

19   one is in Title X.

20        (Reading:) Providing that grants shall be subject to

21   conditions as the Secretary may determine to be appropriate to

22   assure that such grants will be effectively utilized for the

23   purposes for which made, that's Title X.

24       And the one that was not found appropriate, (reading:) The

25   Secretary shall have the authority to issue such regulations as

1    may be necessary or appropriate to carry out this section.

2        There's no difference between those two.  There's no —

3    no.  No material difference between those two.

4        And very clearly, the law before Tennessee was that a

5    general delegation to the agency does not allow it to deny

6    funding under Article I, Section 8 under the power of the purse

7    because that is quintessentially a legislative function.

8        The other issue — so if you'll just look at those two and

9    recognize that there's no published authority.  And I'm

10   assuming Judge McDonough has not published his case, but if it

11   is, he's the only one.

12       And that ought to give you great pause when the referral

13   requirement — I don't want to demean it, so I'm trying to

14   choose — is picayune compared to all the services that

15   Oklahoma offers with Title X funds.

16       And literally, it is score keeping by the federal

17   government.  It's, State of Oklahoma, you're going to bow to

18   our wishes.  Not that that materially helps anybody, because

19   anyone with Google and an iPhone can just Google abortion

20   providers.

21       And so that's what we're talking about.  They're denying

22   $4.5 million in funding to Oklahoma just because we won't hand

23   out a card to give the authority of the State to say, here's

24   your abortion referral.

25       Doesn't matter all the other great things that we can do

1    with this money to the people of the state of Oklahoma.  That's

2    the singular reason.

3         And so that's why you need to pay really attention ––

4    close attention and determine does the Secretary have the

5    authority for that picayune of an issue to deny Oklahoma its

6    Title X funds.

7         The other issue I want to hit just real quickly, and I

8    know I'm going a little long, but I like Mike and he does a

9    good job and I do want to say it's been a pleasure working with

10   the DOJ.  I had my fears, but they've been nothing but

11   collegial and cooperative and I appreciate that.

12        But he made a comment that I think ought to be impactful

13   to you ––

14             THE COURT:  He didn't say you had been nice to him.

15             MR. CLENDENEN:  They have been nice, Your Honor, yes.

16             MR. HILLIS:  It depends on your ruling, Judge.

17             THE COURT:  He's not standing up, even now.

18             MR. HILLIS:  There was a joke I'm glad I didn't tell.

19   This table knows it.

20        When he candidly admits to say it's not clear that

21   Oklahoma law prohibits referrals, that's telling.  Because that

22   impacts allowable under state law.

23        And surely, an agency should not be allowed to force a

24   Title X requirement that even potentially is not allowable

25   under state law.  There's, at a minimum, litigious uncertainty

1    whether a referral is authorized under Oklahoma law.  And with

2    that, the agency was duty-bound to exempt Oklahoma because of

3    that litigious uncertainty.

4            THE COURT:  Do you think the federal government is

5    obliged to not impose any condition that might even relate to

6    an area where there is litigious uncertainty?

7            MR. HILLIS:  When their regulation that they're

8    foisting on us says services have to be allowable under state

9    law, that's the tension.  It's not just a general Oklahoma is

10   bigger than the feds, because we're clearly not.

11       But when their very regulation that they're trying to

12   foist on Oklahoma says services must be allowable under state

13   law, that if there's litigious uncertainty there, then they

14   should say there's litigious uncertainty there, then you have

15   to go back to is the funding requirement unambiguously clear.

16       It's not unambiguously clear, because he said it was not

17   clear whether referrals are prohibited by Oklahoma law.

18       So that right there, even if they had the legislative

19   mantle that they could use the power of the purse, that

20   uncertainty in and of itself mandates that they cannot require

21   Oklahoma to refer for abortions lawfully.

22       And we would request the Court enter a preliminary

23   injunction in this case that says that HHS is prohibited from

24   using the abortion referral as a requirement that denies

25   Oklahoma participation in Title X funding.

1    So I do appreciate the time and attention of the Court and

2    thank you, Your Honor.

3        THE COURT:  Well, this is certainly an involved set of

4    issues that we're dealing with here, and offhand, I don't know

5    of any set of public policy questions that's any more

6    contentious probably than ones involving the abortion issue

7    that's played out in multiple ways over the last, what, 30 or

8    40 years.

9        I saw in the paper that I think the Supreme Court was

10   today entertaining oral argument on some other aspect of the

11   same general topic, so it continues to be a very contentious

12   matter.  And it's been helpful to me to have the comments of

13   the parties, in addition to the extensive written work product

14   that you've submitted.

15       I debated whether to, you know, attempt to generate a

16   lengthy written order or simply to tell you what I'm inclined

17   to do.  I think I am in a position basically to tell you here

18   what — the way I see the issue.  I do that partly because

19   we're getting up here very close to the end of March.

20       There does appear to be some urgency from the State's

21   standpoint to have either a favorable determination from me or,

22   presumably, an opportunity to seek relief from the appellate

23   courts before the April 1st deadline runs.

24       And so I think it makes sense for me to go ahead and

25   essentially rule now as to the pending motion.

60

1    The pending motion, of course, is one for preliminary

2    injunction that requires Oklahoma to establish the elements

3    that we are, I think, all familiar with in general.

4    One's the likelihood of success on the merits that there's

5    irreparable injury if the injunction is not issued, a judgment,

6    that the threatened injury to, and this state, the State, would

7    outweigh any injury to the federal government if the injunction

8    was not issued, and then finally, the requirement that it be

9    not contrary to the public interest to issue the injunction.

10   There is, I think, some of the cases indicate that when

11   we're dealing with a situation like this one where the

12   injunction is sought against the federal government, the

13   elements relating to balancing the injury and the public

14   interest essentially merge.  And I do think that ultimately

15   what we're talking about here is the interest of both the

16   federal government and the State in getting, you know, a proper

17   application of the law.

18   So I don't know that the — either of those factors cut

19   significantly in either direction, although I would say that

20   were I evaluating or to the extent that I'm evaluating the

21   threatened injury to the State of Oklahoma from nonissuance of

22   the injunction, that among the things that jumps out at me is

23   that the State's position here is ultimately premised on what

24   it says Oklahoma law requires.  That is, apparently, the basis

25   for the change of position that Oklahoma took in the course of

1    the grant administration process.  And, frankly, it is my view

2    that that is simply overblown.

3        I have an extraordinarily difficult time seeing how the

4    implementation of the referral process as contemplated by the

5    regulation here could translate into a violation of Oklahoma

6    law.

7        Essentially, it seems to me what that says, if that is

8    true, that means that it would violate the Oklahoma statute

9    which bans, essentially, urging someone to get an abortion.

10   For a department of health worker to say to the client sitting

11   across the table, once they request information on abortion and

12   they say, Well, it's not legal in Oklahoma, but if you want to

13   look at other options, call this number.  I cannot believe that

14   any serious prosecutor would think that warranted prosecution

15   under the statute.

16       And it seems to me the consequence of that is that this is

17   not a situation where Oklahoma's position is driven by what the

18   law compels it to do, but it's rather the policy basis for why

19   Oklahoma would rather not do it.

20       And wanting to not do it is not to me quite the same thing

21   as saying that it would be conduct that would violate the law

22   if they did.

23       So I do think that it seems to me that the posture that

24   Oklahoma finds itself in here is at least, in part, a matter

25   of — it's a circumstance of its own choosing.  Because it

1   would appear to me that there is a path that was always

2   available to Oklahoma whereby it could comply with the

3   provisions of the grant process and do so without requiring

4   anybody to violate Oklahoma law.

5          So as I say, that, I suppose, impacts my assessment of the

6   relative harms here and to some degree it impacts, I suppose,

7   some of the likelihood of success arguments.

8          But as I say, it does seem to me that to the extent it's

9   premised on the assumption that the limited referral

10  contemplated here by the regulations would violate Oklahoma

11  law, let's just say that's less than obvious to me and that

12  impacts some of the rest of this as well.

13         The element of the — whether irreparable injury has been

14  shown or not, I think to the extent that is the basis for it,

15  that I think Oklahoma's made a sufficient showing here of

16  irreparable injury.

17         As Mr. Hillis points out, the *Ohio* case concluded that,

18  involving less money than is involved here.  And, frankly, I'm

19  reluctant to accept the federal government's invitation to say

20  that $4.5 million isn't substantial enough to worry about.

21         I'm reminded of the comment of some senator a few years

22  ago, he said, you know, you start talking about this budget

23  stuff, you got a billion here and a billion there and pretty

24  quick, you're talking about real money.

25         Well, you know, this isn't billions, but it seems to me,

1    for purposes of sufficient showing of irreparable injury, that
2    4.5 million is enough.
3        But, of course, as is often the case in these sorts of
4    circumstances, the challenge, it seems to me here, ultimately
5    turns on or disposition of the motion turns on the question of
6    the likelihood of success on the part of the State.
7        It strikes me that in making that determination, I mean,
8    there's been reference made to things that are unique about
9    this litigation.  It seems to me that there are at least a
10    couple of things that are unique about it that are not involved
11    in your average, you know, fighting over who's got the
12    authority to do what between units of government.
13        One is the fact that there has already been litigation
14    between the parties on substantially the issues arising out of
15    this same dispute.  And, of course, I'm talking about the
16    litigation that resulted in what we've referred to as the *Ohio*
17    case, *Ohio v. Becerra*, the Sixth Circuit case.
18        Ordinarily, a Sixth Circuit opinion wouldn't be binding on
19    me.  It isn't binding here, I suppose, in the sense that a
20    Tenth Circuit decision would be, but it seems to me that it
21    does implicate, because Oklahoma was a party there, that it
22    limits what they're in a position to come here in a second
23    court and re-litigate.
24        Whether it's — you refer to it as res judicata or claim
25    preclusion or whatever, it seems to me the rule rather clearly

1  is that to the extent that the particular claim was litigated

2  in a prior forum, that the State is precluded by the doctrine

3  from re-litigating it here, which is to say that they're not in

4  a position to either, you know, reargue the same argument that

5  was made there or to raise other theories that might ultimately

6  support the same claim.

7      So it seems to me that res judicata claim preclusion does

8  preclude at least part of the arguments that the State is

9  relying on here, particularly those where there are, you know,

10  comments like the statute doesn't even authorize this kind of a

11  regulation or something.

12      It seems to me that those are the kinds of arguments that

13  are essentially precluded by the litigation that has already

14  occurred between the parties.

15      Now, I do recognize that the *Ohio* case involved a facial

16  challenge to the regulation.  And that the focus there was on

17  the 1008 language, but it does seem to me that in terms of how

18  the doctrine of res judicata claim preclusion applies, that to

19  the extent we're talking about a facial challenge to the

20  regulation, that the *Ohio* decision would preclude re-litigation

21  on any theory that was advanced or that might have been

22  advanced, at least to the extent that it's the basis for a

23  facial challenge.

24      And as I say, I think some of the arguments that have been

25  made here today essentially are that.  They're a facial

1    challenge that's barred by the litigation that has already

2    occurred, like, for example, whether they have exceeded their

3    authority by issuing this regulation at all or whether the

4    counseling requirement's outside the scope of Title X.

5        I mean, those are, in my view, facial-type arguments and I

6    don't think you can avoid the impact of just — just by saying,

7    well, we're doing it as-applied.

8        You know, certainly, the application of any rule has

9    consequences, but if it, at a fundamental level, is going to

10   facial attack, then I think it's precluded for that reason.

11       The other thing that strikes me as being unique about the

12   circumstances here is that we're not dealing with a regulation

13   that just got thought up in 2021 or 2022, whenever the current

14   version of the rule was adopted.

15       We're dealing with an area of the law that has obviously

16   reflected the substantial pulling and hauling that's been going

17   on for 30 years over this difficult issue of abortion.  And the

18   question of the kinds of requirements that are to be imposed in

19   connection with this grant program have changed over time.

20       The *Ohio* court, of course, describes in some detail that

21   history.  I won't repeat it here, other than to acknowledge

22   what I think we're all aware of.  And that is that depending on

23   which administration was in the power, the regulatory — or the

24   regulations pursuant to Title X have varied in their treatment

25   of the counseling requirement and the provision of information

1    that would potentially be the basis for referral.  Sometimes
2    it's been required, sometimes it's been prohibited.
3         And I think what is clear from *Rust* is that at least to
4    the extent that we're tying it to the language of 1008, we're
5    dealing with an ambiguous area where *Chevron* deference applies.
6         But I do think that the fact that we have this lengthy
7    history of prior incarnations of substantially the same
8    requirements, as are now at issue in this case, translates into
9    making it a very difficult lift for the State to come in and
10   show arbitrary and capricious regulations when it has that
11   history.
12        I understand there are a couple of aspects that have been
13   mentioned here this morning that maybe differ from it, but at
14   least in terms of the fundamental underlying requirement for
15   the — imposing a condition on the Title X grant that the
16   grantee has to be providing this nondirective information and
17   potentially referral information on request, that's not new.
18   It's not something that is, it strikes me as being, you know,
19   something new and exotic.
20        So I think, as I say, the fact that we have that history
21   makes the whole lift that Oklahoma's attempting here a very
22   difficult one.
23        But that said, I think ultimately evaluating the
24   individual arguments that Oklahoma's offered here on balance, I
25   simply am not persuaded that Oklahoma has a reasonable prospect

1    of prevailing on these arguments.

2        The arguments about the Spending Clause that Mr. Hillis

3    has referenced, I confess I am thoroughly unpersuaded by.

4        We're dealing here not with simply a matter of random

5    delegation of legislative authority, but we're dealing with a

6    grant program.  We're dealing with a grant program in a

7    particular context and for a particular purpose where Congress

8    has specifically said that we expect the agency to promulgate

9    rules to flesh it out.

10       I don't think, as I read the cases, that in those

11   circumstances, that the — whether it's the Spending Clause or,

12   frankly, I'm not sure we're talking about the same thing when

13   we're talking about the Spending Clause versus a nondelegation

14   doctrine.  I suspect those may be different.

15       But, in any event, I'm unpersuaded by that argument.  I

16   mean, the cases that talk about the Spending Clause issues

17   recognize that the notice to the — essentially they say, look,

18   if they're going to be conditions imposed on a grant, or on

19   federal spending, that the State is entitled to know what those

20   conditions are.  You can't mousetrap the State or another

21   grantee by imposing them after the fact.

22       Here, it seems to me, there's no serious argument to be

23   made that the State of Oklahoma didn't know what the conditions

24   were that the HHS folks were going to insist on as a basis for

25   participation in the grant program.

1        The State, of course, had, as I understand it, commented

2  on the regulations.  They had at some point got involved in the

3  *Ohio* litigation to challenge it.  And the regulations

4  themselves, in terms of the particular requirement that's at

5  issue here, the counseling and referral part, was clearly in

6  place at the point where the grant application process went

7  forward.

8        The cases, as I read them, say that in terms of putting

9  the State on notice of what the conditions are, those can come,

10  not only from the statute, but from the regulations pursuant to

11  the statute.

12        And so it seems to me that the -- that this is simply not

13  a circumstance where the State can plausibly say, Well, gee,

14  we've been subjected to these conditions when we didn't know

15  what the deal was.

16        What the deal was has been obvious, it seems to me.  The

17  State doesn't agree with those conditions, and certainly that's

18  -- they're certainly entitled to take a different view.  But

19  that, it seems to me, is something different than saying, Well,

20  we were sufficiently mousetrapped by the conditions, that we

21  ought to be relieved from them now, even though we don't comply

22  with them.

23        So it seems to me that the Spending Clause argument

24  doesn't hunt -- and I frankly think that is probably one that

25  we don't even need to get into the weeds on it, because to the

1    extent that the argument is that regulations on these kinds of

2    things go beyond the -- what's permitted by the Spending Clause

3    or what's permitted by the delegation -- the nondelegation

4    doctrine, it seems to me that's facial in nature.  That goes to

5    whether the regulations can properly approach it at all.

6          And as I said earlier, if it is essentially a facial

7    challenge, it seems to me that's precluded by *Ohio* and the

8    particular litigation context that we've got here.

9          I think to the extent that the State is relying here on an

10   argument that it violates Title X itself, I assume that's

11   essentially an argument about 1008 and that, of course, is

12   exactly what *Ohio* addressed and resolved.

13         And I don't see anything about the circumstances here that

14   in terms of it being -- the fact that it's been applied here,

15   if the underlying objection to it is facial in nature, I don't

16   think you create an opportunity to re-litigate it based on

17   that.

18         So at any rate, it seems to me that the *Ohio* litigation

19   has already concluded that the particular regulation that we're

20   dealing with here is within the scope of what's permissible as

21   against the language of Title X itself.

22         With respect to the termination being based -- or being

23   contrary to the provision of the Weldon Amendment, that is

24   maybe a closer question, just because some of this is not as

25   clear, I think, as some of the other provisions.  But I am

1    frankly not persuaded that the State can establish that one,
2    either.
3        The question I think is essentially one of whether or not
4    the various provisions of -- well, whether the language in the
5    appropriation bill saying that there can't be discrimination
6    against a healthcare entity that refuses to refer for abortion,
7    I think the question there is a threshold matter as what
8    constitutes a healthcare entity.
9        Mr. Clendenen says, well, that means the provider of the
10   services.  I frankly think that is probably the more plausible
11   interpretation of that than to say that the State can object.
12       It strikes me as a very substantial step to say
13   essentially that a state can get the benefit of what's
14   essentially a conscience-protecting kind of amendment just
15   because the particular regulatory requirement is contrary to
16   state policy.
17       I -- from what I have seen of the history of that
18   regulation, it does appear to be focused essentially on
19   assuring that providers are not required to perform some --
20   either perform an abortion or refer -- do something related to
21   abortions contrary to their own conscience or religious beliefs
22   or whatever.
23       And it does seem to me that that's something different
24   than what we've got here, which is essentially the State
25   saying, look, we see -- we prefer a different policy and we

1    don't want to follow it because it conflicts with state policy.

2        So I am skeptical whether the State can ultimately

3    establish that as a basis for showing the Weldon Amendment is

4    somehow eliminating the need for the State to comply with or

5    making it improper for HHS to insist on compliance with the

6    referral portion of that.

7        Again, with the Weldon Amendment, I can't help thinking

8    that, frankly, at least in part, that's in the nature of a

9    facial challenge, more than it is in substance an as-applied

10   challenge.

11       But to the extent that it is as-applied, in the sense that

12   the feds are applying requirement to require the State to at

13   least give a potential -- to give the pregnant woman

14   information via a hotline, it seems to me that, if anything,

15   that as-applied approach to the regulation is a more forgiving

16   standard in terms of what it's requiring from the State than

17   might arguably be required by the regulation.

18       I mean, to be sure the regulation itself says nondirective

19   information, suggesting that it can't be, you know, somebody

20   campaigning for an abortion or trying to urge somebody to do

21   it.  But it does seem to me that, you know, the feds might

22   plausibly seek more than just giving out a phone number.

23       But, ultimately, it appears that the circumstances here

24   are simply by supplying a phone number, the State could meet

25   its referral obligations, as contemplated by the grant terms.

1        And so it seems to me that even to the extent that we try

2   to apply the Weldon Amendment beyond that to in some as-applied

3   circumstance, that you have a hard time translating that into a

4   violation here.

5        That leaves, finally, the issue of whether or not this

6   regulation is — and particularly its application to Oklahoma

7   through the termination for failure to do referrals, is

8   arbitrary and capricious under the APA.

9        It seems to me that, as I said at the outset, that in

10  terms of the explanation for the particular requirement that

11  the rule's explanation of it is ample.  It's more or less the

12  same rationale that was in place for, what was it, '81 to

13  '89 or whatever the time period was, where essentially the same

14  rule was in place.

15       I certainly recognize that there are respectable different

16  views as to what the best regulation should be or what a good

17  regulation would be as it applies to this issue, and it's

18  obviously changed over the years, but to suggest that the

19  present regulation is arbitrary and capricious I think simply

20  falls short.

21       The explanation has been given in the order continuing the

22  rules as to the basis for it.  It seems to me that is plainly

23  within the scope of the agency's discretion to make that.

24       I don't think it — that to say, well, that there's

25  litigious uncertainty about it; that's not the test for whether

1  it's arbitrary and capricious.  There's plenty of litigious

2  uncertainty about everything.

3      It does not translate into a basis for concluding here

4  that the particular regulation was arbitrary and capricious.

5      The Tennessee case that the parties have referred to, I

6  think goes into more detail in terms of the history of the rule

7  and so on and I'm — I am in substantial agreement with that

8  case's treatment of the arbitrary and capricious issue.

9      To the extent that the State here is relying on the

10  language in the rule that talks about the allowable under state

11  law provision, it does seem to me that it most plausibly makes

12  sense to understand that as relating to the professional

13  qualifications of the providers that are involved, simply

14  because that's a construction of it or an interpretation of it

15  that avoids the conflict that arguably would otherwise exist

16  with the other provisions.

17      I think under the various deference standards that apply

18  to particularly an agency's interpretations of its own

19  regulations, as opposed to interpretation of a statute, *Chevron*

20  is — *Chevron* is interpreting regulations based on a statutory

21  command.

22      We're talking here about whether a — the HHS's

23  interpretation of the regulations, of their own regulations is

24  entitled to deference and it seems to me that it is.  Which is

25  to say that the language that appears in — that's been

1    referred to about allowable under state law doesn't have the
2    meaning that the State would prefer to attach to it here, so as
3    to suggest some general requirement that state law is going to
4    generally trump all other regulatory provisions that might
5    apply.
6        So, in any event, it does seem to me that on multiple
7    grounds, that the State is unlikely to be able to prevail here,
8    and as a result, I'm going to deny the request for a
9    preliminary injunction.
10       What I would ask is that — I don't know precisely how the
11   parties will go forward in light of this determination.  I
12   assume the State will seek some kind of relief from the
13   circuit.  If you do, then, obviously, that will govern the
14   direction in which the case goes forward, consistent with what
15   the circuit decides.
16       If you decide not to do that or the circuit denies relief,
17   then I would like the parties to think through where that
18   leaves us.  If there is magic to this April 1st deadline and it
19   isn't met, for whatever reason, does that make the case moot or
20   not?  I don't know.  It simply potentially impacts how we go
21   forward as a scheduling matter with the balance of the case.
22       So what I would ask is that the parties file something
23   within the next let's say three weeks to give me your
24   respective positions as to how we go forward, if at all here,
25   in light of whatever you may seek from the circuit or whatever

1    they may do in the meantime.

2         Questions from the parties or anything further that we

3    need to address while we're here today?

4              MR. HILLIS:  I take it there is going to be some sort

5    of written order, but —

6              THE COURT:  What I anticipate doing is simply an order

7    that says it's denied for the reasons that I've said here

8    today.

9              MR. HILLIS:  Okay.  Can I order the transcript then

10   now or do I —

11             THE COURT:  Now or when, I think you're entitled to a

12   transcript, so we'll see that you get one.

13             MR. HILLIS:  I do appreciate it.

14             THE COURT:  Anything else?

15             MR. HILLIS:  I think we can be can beat the three-week

16   deadline, Your Honor.

17             THE COURT:  All right.

18        Anything else?  All right.

19        Court's in recess.

20        (Adjourned.)

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Susan J. Fenimore, Federal Official Realtime Court

4    Reporter, in and for the United States District Court for the

5    Western District of Oklahoma, do hereby certify that pursuant

6    to Section 753, Title 28, United States Code that the foregoing

7    is a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter and that

9    the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11        Dated this 29th day of March, 2024

12

13

14        /s/SUSAN J. FENIMORE

15        Susan J. Fenimore, CSR, RPR, FCRR
          Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25